OLIPHANT *v.* OLIPHANT.

Opinion delivered June 18, 1928.

614

*C. M. Martin* and *Gaughan & Sifford*, for appellant.
*Pat McNally* and *Jordan Sellers*, for appellee.

WOOD, J. This is an action for divorce instituted by the plaintiff, O. C. Oliphant, against his wife, Helen Oliphant. In his original complaint the plaintiff sets up personal indignities by the defendant toward the plaintiff such as to render his condition in life intolerable, specifying same, and in an amendment to his complaint he alleged that the defendant was guilty of acts of adultery, as follows: First, that on the 20th day of April, 1927, the defendant, in company with a male person about thirty-eight years of age, whose name is unknown to the plaintiff, occupied a room in the Sylvia Hotel, in the

town of Smackover, from 10:30 in the forenoon until about noon of the same day; that they were alone in said room, the door to the room being locked, and that the bed of the room had been used. Second, that on or about the fifteenth day of March, 1927, the defendant left the city of Camden, Arkansas, at about 9 o'clock P. M. of said day, in plaintiff's car, in company with a male person about thirty years of age, weighing 135 pounds, having light hair, and being a tall and slender person; that they drove out of Camden on the Stephens Highway, and parked said car near the covered bridge across Two Bayous, and, after parking said car, this defendant, in company with said male person, whose name to this plaintiff is unknown, left the car by the roadside and went into the woods near by and stayed for about one hour, after which time they came back to the car and drove into the city of Camden."

Plaintiff alleged that he had been twice married to the defendant; that, as the issue of the first marriage, there was a daughter eight years of age. The plaintiff prayed for an absolute divorce from the defendant and for the care and custody of their daughter.

The defendant, in her answer, denied specifically the indignities charged in the complaint and the acts of adultery. She alleged that, during their first marriage and after the birth of their daughter, she had procured a decree of divorce from the plaintiff; that, while this divorce proceeding was pending, the plaintiff and the defendant agreed that she would take $1,000 as alimony, and that, in lieu of support and maintenance for their child, he would take custody of the child and support the same until they were remarried; that plaintiff promised to remarry the defendant, but, after the former decree of divorce was granted, had refused to comply with this agreement, telling the defendant that the decree of divorce had given him custody of the child, and she should not have the same. Defendant alleged that she and plaintiff were remarried in January, 1927, and that she had been a dutiful wife at all times. By way of cross-

complaint defendant alleged that, on the 30th of April, 1927, the plaintiff drove defendant from their home at the point of a pistol, without any cause whatever. She further set up that he had repeatedly cursed her and threatened to kill her, and had beaten her several times. She specifically alleged other acts of indignity and cruel treatment. She set up that the plaintiff was of immoral character, and not a fit person to have custody of their child. She alleged that she could and would furnish a good Christian home for the child, if given the custody thereof. She averred that the plaintiff possessed valuable property, describing same. She prayed that she be granted an absolute divorce from the plaintiff, and be given the care and custody of their daughter, Grace, who was then seven years of age, and that of the personal property and real estate of the plaintiff she be given as the law provides.

In his answer to the cross-complaint the plaintiff denied specifically the allegations of the defendant as to his ill treatment of her, and alleged that at all times he had treated her with proper respect and kindness. He renewed the allegations of his amended complaint as to the acts of adultery of the defendant and also as to other indignities heaped upon him by her. Answering her cross-complaint for support and maintenance, the plaintiff alleged that on January 23, 1927, plaintiff and defendant entered into a prenuptial contract by which each agreed that, in the event they separated, the defendant would not ask for alimony or any other expenses from the plaintiff, which contract the plaintiff filed and made an exhibit to his complaint. Plaintiff, in a further amendment to his original complaint, set up that the decree of the Drew Chancery Court granting a divorce to the parties was still in force and effect, and therefore that the last marriage, on January 23, 1927, was void.

The defendant moved to strike this last amendment from the files, which motion the court granted, to which ruling the plaintiff duly objected and excepted.

The cause was heard upon the pleadings and upon the testimony adduced in the form of depositions and also oral testimony, which has been properly brought into the record. The trial court found as follows:

(1) That the appellant failed to establish a single charge of adultery; (2) that appellant was guilty of such cruel and barbarous treatment to appellee that she was entitled to a divorce from him, and the custody of the child. (3) That the antenuptial contract was executed on Sunday, had never been ratified, and is void; and that appellee is entitled to dower in all of the property of appellant. (4) That, in addition to dower, she is entitled to recover from appellant $100 per month for seven months as alimony, and $50 per month thereafter for the support of the child. (5) That appellee is also entitled to recover, in addition to the alimony in paragraph 4, one-third of all of appellant's property, both real and personal.

The court entered a decree according to its findings, from which is this appeal.

1. All the judges have read the abstract of the appellant's counsel. After thus carefully examining the entire record, a majority of the judges have reached the conclusion that the finding of the trial court on the issue as to whether or not the appellee had been guilty of the acts of adultery as set forth in the pleadings and also the other acts of adultery not set forth in the pleadings, but upon which testimony was adduced by the respective parties, is not clearly against a preponderance of the evidence. The testimony is exceedingly voluminous, and a discussion of the facts giving the reason for the conclusion we have reached would serve no useful purpose as a precedent.

In *Leonard* v. *Leonard*, 101 Ark. 528, 142 S. W. 1135, we quoted from 14 Cyc. 693-696, as follows:

"The charge of adultery may be sufficiently proved by evidence of circumstances leading to an inference of guilt. It is impossible fully to indicate the circumstances which will lead to such a conclusion, because they may be

infinitely diversified by the situation and character of the parties and by many other incidental matters which may be apparently slight and delicate in themselves, but which may have most important bearings in the particular case. While the circumstances need not be such that an inference of guilt is the only possible conclusion that can be drawn therefrom, yet the facts must be such as to lead a just and reasonable man to the conclusion of guilt. They are not sufficient if they merely justify a suspicion of guilt, in the absence of other incriminating circumstances. * * * So, where the circumstances adduced in support of the charge are capable of two interpretations, one of which is consistent with innocence, the divorce should not be granted. If an adulterous disposition on the part of defendant and the alleged paramour is shown, and it appears that there was an opportunity for them to commit the offense, these facts are sufficient to establish adultery. * * * To have this effect, the opportunity must occur under incriminating circumstances. * * * Adultery may be established by the fact that the parties occupied the same room at night, or the same bed, in the absence of an explanation of the incriminating circumstances.''

The great law writer, Mr. Bishop, in his excellent work on Marriage and Divorce, vol. 2, p. 520-521, §§ 1360 and 1361, says: ''Then, remembering that the burden of proof is on the accuser, not the accused, we should be able to discern clearly that adultery, not simply a suspicion of it, is the true solution of all. * * * The inference of guilt or innocence to be drawn from the proven circumstances does not depend on technical rules.'' The author then quotes what is said by one of the ecclesiastical judges of England, Lord Stowell, in *Loveden* v. *Loveden,* 2 Hag. Con. 1, 4th Eng. Chy. 461-462, and also to the same effect from the eminent Chief Justice Shaw of Massachusetts, in *Dunham* v. *Dunham,* 6 Law Reporter, 139-141, as follows:

''Nor can this course of inquiry and process of reasoning and judging be much aided by technical and artificial rules, or by what are considered established pre-

sumptions of fact from other facts. These rules are useful and convenient in their way, in suggesting general considerations, which are applicable to many cases; but, after all, they are to be taken with so many exceptions and so much allowance that in the result each case must depend mainly upon its own peculiar circumstances. It is impossible therefore to lay down beforehand, in the form of a rule, what circumstances shall and what shall not constitute satisfactory proof of the fact of adultery, because the same facts may constitute such proof or not, as they are modified and influenced by different circumstances.''

See also Keezer on Marriage and Divorce, p. 196, § 242; Schuyler on Marriage and Divorce, Separation and Domestic Relations, p. 179, § 1567; 19 C. J., p. 128, § 2.

When the facts of this record are considered in the light of the above authorities, we are convinced that the trial court was correct in finding that the appellant failed to establish a single charge of adultery against the appellee. The appellee, in her answer, denied the specific acts of adultery charged in the complaint, and she sufficiently rebuts in her testimony the testimony brought forward by the appellant to sustain these charges. The other supposed acts of adultery not alleged, but which the appellant sought to prove by the testimony adduced, the appellee also specifically refutes by her own testimony and corroborating testimony, which was sufficient to convince the chancery court, and is sufficient to convince us, that the charge of adultery has not been established.

2. We are likewise convinced that the trial court was correct in finding that the appellant was guilty of cruel and barbarous treatment of the appellee, and ruled correctly in granting her a divorce on such ground. The appellee testified to acts of violence committed by the appellant upon appellee's person, and to profane, abusive and insulting language used by the appellant toward her. She was sufficiently corroborated by the testimony of other witnesses as to this conduct to justify the trial court in finding that the appellant was guilty of such cruel and barbarous treatment of the appellee as to entitle her to a

divorce on the ground that such conduct offered such indignities to the person of appellee as to render her condition intolerable.

3.   The court did not err in giving to the mother the care and custody of her daughter, who, at the time of the rendition of the decree, was only eight years of age. If the appellant had succeeded in proving the charge of adultery on the part of the appellee, as set up in his amendment to the original complaint, we would not hesitate to reverse the decree of the trial court awarding the care and custody of the child, Helen Grace, to her mother, the appellee.   But, since we have concluded that the appellant has failed to prove that the appellee is an adulteress, it occurs to us that the decree of the trial court was correct· in awarding the custody of the child to its mother.   The appellant argues that this should not have been done, for the reason that the chancery court of Drew County, in a former decree granting the appellee a divorce from the appellant, had awarded the custody of their child to the appellant, citing the cases of *Wetherston v. Taylor,* 124 Ark. 574, 187 S. W. 450; *Nelson v. Nelson,* 146 Ark. 362, 225 S. W. 619; *Jackson v. Jackson,* 151 Ark. 9, 235 S. W. 47.   These cases hold that where, in a decree of divorce, the custody of the ‚child is awarded to one of its parents, such decree is final, unless there has been in the meantime a change of circumstances justifying the court in giving the award to the other parent. But those cases have no application to the facts of this record, for the reason that there has been a change in the circumstances justifying the decree of the trial court in this action in awarding the custody of the child to its mother.   Since the former decree of the chancery court the appellant and the appellee have remarried.   That, of itself, wrought an entire change in the status of the appellant and appellee toward each other and the circumstances that existed at the time the former decree was rendered and at the time the decree was rendered from which this appeal comes.   The remarriage of the parties after the first decree had the effect of establishing the status

of the parties as husband and wife and restoring their relation as such to the child, the same as if there had been no former divorce. The relation of the child to its parents after the second marriage was precisely the same as if the child had been born after the second marriage. The child was the offspring of the first marriage. When the parents were divorced by a decree of the Drew Chancery Court, the custody of the child was changed from their joint custody to the custody of the father, and when the parents were remarried the joint custody of their child necessarily was re-established. See Acts of 1921, p. 317, Castle's Supplement to C. & M. Digest, § 4980 (a). Then, when the appellant sought by this action a divorce from the appellee, he thereby necessarily put in issue the matter of the custody of the child. The appellant recognized that the care and custody of the child was in issue, because he set up in his complaint that the appellee was "an immoral character, and an unfit person to have the custody of their said minor child, and that she is unable to support, maintain and educate said minor," and prayed that he be granted "the care and custody of their said minor child."

In our very latest case changing the custody of a child, which had been fixed by former decree of divorce in one of its parents, to the other parent, we cited *Weatherton* v. *Taylor, supra,* which case cited and quoted 9 R. C. L., p. 476, concluding the quotation as follows: "A decree fixing the custody of a child is, however, final on the conditions then existing, and should not be changed afterwards, unless on altered conditions since the decree, or on material facts existing at the time of the decree but unknown to the court, and then only for the welfare of the child." *Hamilton* v. *Anderson,* 176 Ark. 76, 2 S. W. (2d.) 673.

Section 3508, C. & M. Digest, provides: "When a decree shall be entered, the court shall make such order touching the alimony of the wife and care of the children, if there be any, as, from the circumstances of the parties and the nature of the case, shall be reasonable."

In *Hamilton* v. *Anderson, supra,* we held: ''The custody of a child or children is not awarded for the purpose of gratifying the feelings of either parent, or with an idea of punishing or rewarding either, but, under the statute as well as from considerations of equity, for the best interests of the child or children, and keeping his or their best interests primarily in view.'' Other cases of our court announcing this doctrine are cited in the opinion in that case. Such is the policy of our law as recognized, not only by the decisions of our Supreme Court, but now also by statute. See Acts of 1921, p. 317, § 3.

We will not incumber the record by setting out and discussing the facts, but simply announce our conclusion to be that the trial court correctly appraised the evidence in this record when it found that the appellee was a fit and proper person to have the custody of her daughter, who, at the time of the rendition of the decree, as we have stated, was eight years of age; and the court ruled correctly in rendering a decree awarding such custody to the appellee. The conditions that existed at the time the decree was rendered unquestionably proved that the mother was the proper one to have the care and custody of this little girl. The conduct of the appellee showed that she loved her child as only a mother can love; the proof shows that the mother and child will have a good home, with far better environment for the daughter than she had at the time of the rendition of the decree. The mother testified that she was in good health and physically able to care for the child; that she was going to live with her father and mother. Here the child would have better home surroundings than she had under the former decree, when the appellant was awarded custody of the child.

4. The trial court found that the prenuptial contract made and entered into by and between the plaintiff and defendant and introduced as evidence in the cause was executed on the Sabbath, and had never been ratified since its execution, and that same was therefore void.

The appellant contends that in so finding and holding the court erred.

The antenuptial contract entered into between the appellant and appellee was executed on Sunday, January 23, 1927. It set forth in substance that the parties had been previously married and divorced, and that the custody of their daughter, Grace Oliphant, by the decree of the court, had been awarded to the appellant; that it was the desire of the parties to reunite in marriage *in order that the child might have the love and personal care of both parents;* that each had certain personal property, and were desirous, in contemplation of their remarriage, to settle their property rights; that, in consideration of $1 *and mutual advantages of the marital relation to themselves and to their daughter,* they agreed that the appellant would bear the family expenses, and, if the appellee should die first, the appellant would not claim any curtesy in her property, real or personal, which she then had or might acquire; and they further agreed that appellee, in lieu of her dower and homestead, would accept the above considerations, and would not claim, either before or after appellant's death, any dower or homestead in the property thereafter acquired, but that same, in case of his death, should belong to his estate.

The appellant testified with reference to this contract that he and the appellee were married on the day the contract was executed. Appellant didn't know that the appellee had no property—never gave it a thought. The reason he had appellee sign the contract was that he was trying to establish confidence in her, and, if she acted as she had before, he wanted to keep her from getting his property. He wanted her to come back and raise his child, and told her that, if she would be the right kind of a wife, he would destroy the papers. Appellant gave appellee a copy of the contract. The appellee told the appellant that she didn't have a copy, but appellant was convinced that she had a copy.

The appellee testified concerning this contract that she had been in Camden a week before the contract was

executed—she went there for the purpose of getting married. She was in appellant's cafe on January 23, and appellant said to her, "I am ready for us to go to Fordyce and be married." They left for Fordyce about 1:30, and, when they got about three miles from Fordyce, appellant stopped the car and said. to appellee, "You must sign this paper, or I won't marry you," and appellee replied, "I don't want your property—it is you and the baby I want." Appellee wanted the baby, and she signed both of the contracts, and gave them back to the appellant, and he took both of them and kept them, and knew that she didn't have any property. The contract was executed on Sunday. Appellant suggested to the appellee that she could not have her baby unless she signed the contract. The consideration for signing of the contract was that appellant would marry appellee and she would thereby get possession of her little child. The marriage was performed by a Methodist minister.

Learned counsel for the appellant contend that, although the contract was executed on Sunday, it was ratified by the conduct of the parties to the contract in marrying and in continuing their marital relations until they separated some months later. The contention of counsel as to the ratification of the contract is sound, and, if the contract be otherwise valid, then the court erred in not enforcing same. Counsel claim that the contract should be held binding upon the parties as to the disposition of the property under the authority of *Comstock* v. *Comstock,* 146 Ark. 266, 225 S. W. 621. In that case, among other things, we said: "Marriage was a sufficient consideration for the antenuptial contract. Where such contracts are freely entered into and are not unjust or inequitable, and there is no fraud, they should be liberally construed to effectuate the intention of the parties, and should be looked upon with favor and enforced accordingly." The facts in that case clearly differentiate it from the case at bar, but, under the doctrine of that case, this contract cannot be enforced for the reason that, on its face, it shows that the principal

consideration of the contract was that the appellant and appellee should reunite in marriage *in order that their child should have the love and personal care of both parents.* A further consideration, as stated, was the *"mutual advantages of the marital relation to each of the parties hereto as well as the advantages of the said union to our said daughter."* These considerations failed when the parties to the contract were divorced; and the contract was breached by appellant when he so conducted himself toward appellee as to entitle her to divorce. See 1 Bishop on the Law of Married Women, § 426. Such considerations are legal, and will uphold an antenuptial contract where entered into in good faith, that is, where the parties at the time of marriage intend to live together until they are separated by death. But an antenuptial agreement in which the parties, or either of them, at the time of entering into such agreement and at the time of their marriage, intend such disposition of the property as is agreed upon only in case there should be a divorce, is void and unenforceable, because such contract is against public policy. See 13 C. J., § 406; 19 C. J., § 585. Antenuptial contracts, to be valid, must be made in contemplation of the marriage relation subsisting until the parties are separated by death. See Peck, Domestic Relations, § 43. If such an agreement is made in contemplation, at the time of its execution, that the parties, or either of them, expect to be divorced, then such an agreement is void *ab initio.* According to the appellant's own testimony, he entered into the antenuptial contract with the appellee because he "was trying to build up a confidence in her." He wished "to deprive her of any of his estate because he didn't think, if she acted as she had before, that she would be entitled to it." At the time he entered into the contract he "didn't believe she would act like she did before," as strong as he believed it at the time he gave his testimony. "He wanted the appellee to come back and live with him and raise their child, and told her that if she would be the right kind of a wife he would destroy the antenuptial contract."

The antenuptial contract, as interpreted by the appellant himself, was absolutely void, because such a contract would be unjust, inequitable, unconscionable, and without mutuality of obligation. He thus placed upon his confiding spouse the brand of his suspicion and held over her head, so to speak, the antenuptial contract as a club to enforce her good behavior, for he says himself, "I told her if she would be the right kind of a wife I would destroy these papers" (meaning the antenuptial agreement). But there is nothing in the contract, as he interpreted it, that also binds him *"to be good"* and to "destroy the papers" —the contract—in case he so conducted himself as to render her condition intolerable. The contract, construed as appellant himself says he intended it, was a fraud on appellee's statutory rights. Section 3511, C. & M. Digest. Under such a contract it was within his power, by his own wrongdoing, to deprive his wife of all her statutory rights of property. Such an unfair, unreasonable and unconscionable contract no court will enforce. 1 Bishop, Married Women, §§ 424, 426. We conclude therefore that the trial court ruled correctly in declaring the contract void, although an erroneous reason was assigned for the ruling.

5. It follows, since the decree was in favor of the appellee, that the trial court did not err in awarding to the appellee one-third of her husband's personal property absolutely and one-third of his real estate as designated in the decree. Section 3511, C. & M. Digest. But the court erred in rendering a decree for alimony in the sum of $100 per month for seven months. The trial court evidently entered its decree for this sum on the theory that the appellant had obtained this sum from the appellee during the marriage, and in consideration or by reason thereof. But such is not the fact, because at the time the appellee let the appellant have the sum of $700 they were not married.

A majority of the court has concluded that the sum of $50 per month allowed for the support, maintenance

and education of Helen Grace Oliphant, their child, while liberal, is not extravagant.

6. There is no merit in appellant's contention that the court erred in striking from the files the amendment to the appellant's complaint, in which he pleaded that the divorce decree of the Drew Chancery Court was still in full force and effect, and that the subsequent marriage of appellant and appellee was therefore void. As authority for this contention, appellant relies upon § 3513, C. & M. Digest, which reads as follows: "The proceedings for annulling a final judgment for a divorce from the bonds of matrimony shall be a joint petition of the parties, verified by both parties in person, filed in the court rendering the judgment, upon which the court may forthwith annul the divorce." A divorce *a vinculo matrimonii* dissolves the marital bonds absolutely and restores each spouse to all rights, privileges and immunities of unmarried persons, just as though there had never been a marriage between them. The effect of such decree, of course, is to place the parties in a situation where they are free to contract marriage with each other again, or with any one else. The statute has no application in cases where there has been a reunion of formerly divorced parties by a remarriage. It evidently applies to cases where the parties become reconciled to each other, and, for this reason, desire to proceed by joint petition under the authority of the above statute to have the former decree of divorce vacated without remarrying. See *Chase* v. *Chase,* 191 Mass. 166, 77 N. E. 782; *Thomas* v. *James,* 69 Okla. 285, 171 Pac. 854. In these cases the courts construe statutes similar to the statute under review, and hold that such statutes do not prohibit persons who have been divorced from remarrying. In these cases it is held that the law favors settlement of domestic difficulties and reconciliation between husband and wife, and that such reconciliations might be effected without a remarriage, and that statutes of this nature were not enacted to prohibit remarriage of persons who

had been formerly divorced, and that such remarriages were not void.

The decree of the trial court will therefore be reversed and modified in so far as it allows the appellee alimony in the sum of $100 per month for seven months, beginning November 1, 1927, and this allowance will be eliminated. In all other respects the decree is correct, and, as modified, it will be affirmed.

SMITH, KIRBY and MEHAFFY, JJ., dissent.