ETHEL H. HUGHES *v.* JOHN L. HUGHES

5-5563                                      471 S.W. 2d 355

Opinion delivered October 4, 1971

*Whetstone & Whetstone,* for appellant.

*Hall, Tucker & Lovell,* for appellee.

CARLETON HARRIS, Chief Justice. Appellee, John L. Hughes, age 75, a widower for approximately ten years, and Ethel H. Hughes, age 70, appellant herein, were married on June 23, 1967. Nine days prior to the marriage, these parties executed an ante-nuptial agreement, such agreement setting out that each owned real and personal property; that each had children from former marriages, and each agreed that the forthcoming marriage would in no way, alter legal rights to their separate property, nor that of the children to inherit. The

agreement was recorded, but six days after the marriage, Hughes executed a will leaving the home to Mrs. Hughes, though there was no such provision in the ante-nuptial agreement. On August 23, 1969, Hughes executed a deed conveying two pieces of commercial property to appellant, and he also executed another deed to the home place creating an estate by the entirety with Mrs. Hughes. After various difficulties, hereinafter mentioned, Mrs. Hughes left the home on Tuesday, April 28, but, as she testified, "I felt like I had maybe made a mistake in my decision to leave; that was my home. I realized I didn't have a home any longer in Little Rock and I had given all of that up. That was my home; he had said it was my home. I married him to live in it and to live with him and I went back and told him I was back to stay".

Hughes instituted suit for divorce on the following Monday, May 4, alleging general indignities, and also asserted that the deeds had been obtained by appellant through undue influence and threats, and he prayed that she be required to reconvey to him. Mrs. Hughes answered, denying the allegations of the complaint and asserted that appellee's daughter, Mrs. Carolyn Davenport, was responsible for the institution of the suit. She admitted the execution of the ante-nuptial agreement but asserted that the terms were inequitable, unfair and unconscionable, and that said agreement should be nullified. After the filing of interrogatories and the taking of discovery depositions, the case proceeded to trial, with each side presenting testimony. At the conclusion, the chancellor, though commenting that the evidence was "slim", granted appellee an absolute divorce; the court also held that no fraud had been committed relative to the execution of the ante-nuptial agreement, and it was held entirely effective, with the exception of the deeds in which Hughes conveyed commercial property to his wife, and also the deed creating an estate by the entirety. It was pointed out that the evidence had reflected an oral agreement between the parties, supplementing the written instrument, providing that Hughes would either will or convey to Mrs. Hughes some business property and would provide a home for her. The court

found that these conveyances were executed voluntarily by appellee.[1] It was further ordered that the joint bank account should be divided equally; that the automobile was joint property and each party held equal interest; the use of the home was awarded to appellant during her lifetime, and would become the property absolutely of the surviving party. Further, appellant was allowed $400.00 per month from the time of the institution of the complaint until the date of the decree, but alimony for the future was denied. An attorneys' fee in the amount of $2,000.00 was granted counsel for appellant for services rendered. From the decree so entered, appellant brings this appeal. Four points are asserted for reversal, which we proceed to discuss, though not in the order listed by appellant.

It is appropriate to here state that appellee died on August 4, 1971, and his daughter, Carolyn Davenport, was appointed executrix of the will of John L. Hughes on August 9. It was suggested to the Supreme Court by motion that the cause should be revived in the name of Mrs. Davenport as executrix and this motion was granted on September 13, 1971. For convenience, appellee will be referred to throughout the opinion as John L. Hughes.

Appellant asserts that the court erred in holding the ante-nuptial agreement valid, and the initial attack is upon one of the provisions of the agreement (paragraph five) which reads as follows:

"That either party hereto may make disposition of his or her property during his or her lifetime as he or she sees fit; and should this marriage become dissolved by divorce, or by the death of either party, neither party shall hold or claim any part or interest in the estate or property of the other by way of curtesy, dower, homestead, family allowance or other right."

Appellant contends that the language "should this marriage become dissolved by divorce" invalidates the

---

[1]This finding is not now at issue, no cross-appeal having been filed.

agreement under the authority of *Oliphant v. Oliphant,* 177 Ark. 613, 7 S. W. 2d 783, where this court held that an ante-nuptial contract, to be valid, must be entered into in good faith, i. e., at the time of marriage the parties intend to live together until they are separated by death, and stated:

"But an antenuptial agreement in which the parties, or either of them, at the time of entering into such agreement and at the time of their marriage, intend such disposition of the property as is agreed upon only in case there would be a divorce, is void and unenforceable, because such contract is against public policy. * * * * If such an agreement is made in contemplation, at the time of its execution, that the parties, or either of them, expect to be divorced, then such an agreement is void *ab initio.*"

We do not agree that the provision in the instant case invalidates the contract. The entire paragraph, heretofore quoted, seems designed to cover all contingencies, *i. e.,* it is a "Mother Hubbard" provision. It will be noted that it also refers to the death of either party and the *Oliphant* language clearly says that an ante-nuptial agreement is void and unenforceable if it was entered into by the parties to become effective *"only* in case there should be a divorce". As stated, that is not the situation here, nor is there any indication in the evidence that at the time the agreement was executed, the parties, or either of them, expected the marriage to be dissolved by divorce.

Nor do we agree that the circumstances surrounding the execution of the agreement were such as to invalidate its provisions. In *Davis v. Davis,* 196 Ark. 57, 116 S. W. 2d 607, and *Wylie v. Wylie,* 249 Ark. 316, 459 S. W. 2d 127, the requirements for a valid antenuptial agreement were set forth. This court said that generally speaking, such an agreement must be freely entered into by the parties, must not be unjust or inequitable and must not be tained with fraud. In *Wylie,* we said:

"The burden here was, therefore, upon appellants to prove, by satisfactory evidence, that appellee had knowledge of the character and extent of her husband's property, and of the provisions and effect of this instrument, or, at all events, *that the circumstances were such that she reasonably ought to have had such knowledge at the time this instrument was executed* [Emphasis supplied]."

It is absolutely clear from the evidence that in the case before us the agreement was freely entered into. In her discovery deposition, appellant testified that she read the agreement, and understood it and when asked about the provisions separately, replied, not once, but several times, that she fully understood all provisions, stating, "I agreed to everything in there". She said that Judge Hughes had told her that he would make a will after they were married, giving her the house and two pieces of commercial property; accordingly, she said, "So it was alright with me". Mrs. Hughes stated that the agreement was shown to her about two weeks before she signed it and that she had an opportunity to take it to a lawyer. In testifying before the court, appellant stated "I was not too interested in his holdings at that time. I was interested in a nice life with what we had to live the rest of our lives. We didn't have much time and I was not concerned with the value of his property." She mentioned several properties that she owned at the time of the marriage, and stated that she had no intention of her husband acquiring any interest in these properties when the agreement was signed. She added "He wasn't interested in acquiring any interest".

Likewise, there is no evidence whatsoever of fraud. In *Wylie* v. *Wylie supra,* we said:

"Without any hesitation whatsoever, we hold that the evidence is more than ample to support the view taken by the trial court, *viz*, that the value of Mr. Wylie's properties, and his financial status, were far in excess of the figures given to the present Mrs. Wylie at the time the antenuptial agreement was entered into; that

she had no knowledge to the contrary and fully depended upon the statement of her husband-to-be in consenting to enter into the agreement."

Here, there is no contention that Hughes set a value upon his properties which was less than its actual value; in fact, there is no testimony that property values were even discussed by the parties. Appellee's testimony was that he did not know the value of his holdings, and the evidence throughout indicates this to be a true statement. It also appears from the record that due to age and ill health, Judge Hughes was not as mentally alert as formerly. At any rate, there certainly is no evidence of designed concealment of his financial worth, nor of fraud in any respect.

The only legal basis for the attack on the agreement lies in the fact that it might be said that the provisions for the intended wife were disproportionate to the means of the intended husband. Wesley Adams, a real estate appraiser in North Little Rock, placed the value of the Hughes properties at between $350,000 and $400,000. Appellant argues that under the terms of the agreement, she was to receive nothing, it being argued by her counsel that the deed to the home and the two commercial properties were only "gifts", but we do not subscribe to that view. Some of the answers of Judge Hughes on this point were evasive; for instance, when asked if he had told her that he would give her a home and also a "piece of business property", he responded "I don't know what I told her. That has been about four years ago". From the record:

"Q. Is it possible that you told her that?

A. I told her—I don't know."

We think the preponderance of the testimony clearly establishes that this oral agreement was reached, and was thus a part of the over-all agreement between the parties, one pertinent fact being that appellee did execute a will less than a week after the marriage leaving the home to appellant. Subsequently, as heretofore

stated, this property was conveyed to the parties as an estate by the entirety and two business properties were conveyed to appellant. It appears that the value of the home place is $25,000 to $40,000, and the value of the two commercial properties (Edwards' Cafe and Darnell's Jewelry Store) about $25,000. These last two yield a rental of $225.00 per month.[1a] Though appellee prayed for the recovery of these properties in his complaint, the court found that appellant was entitled to them, and there has been no cross-appeal. So—Mrs. Hughes did not leave the three year marriage empty handed; to the contrary, she received properties of an approximate value of $50,000 to $65,000.

Probably more important than the matters already mentioned is the fact that appellant was an experienced real estate broker, had used several attorneys in past years, and had formerly lived in Benton. As to knowledge of the property owned by Judge Hughes, appellant, at the time the agreement was entered into, knew that he owned a home in Rivercliff (in which she is living, having acquired this property as the surviving spouse under the tenancy by entirety), knew that he owned another old home (in which his sister now lives), knew that he owned several business properties, and knew that he owned farm property (but did not know about the timber). In fact, it appears that she was familiar with most of his holdings, though she stated that she was not familiar with the value of these properties. The record reflects that she had been active in the real estate business for approximately 25 years, and had worked quite awhile for Fausett & Company in Little Rock. She showed and sold real estate, and had held a broker's license for at least 15 years. To obtain this license, it was necessary that she take an examination and answer questions concerning real estate transactions. She had worked in Benton, Arkansas, as a nurse for several years prior to 1923. Hughes was a prominent citizen of the community, his great-grandfather having laid out the town of Benton, and most of the Hughes property had

[1a] The evidence reflects that income from her own properties and social security benefits give Mrs. Hughes an approximate total net income of $500.00 per month.

been in the Hughes family for a long number of years. Mrs. Hughes had known appellee before the death of his first wife, the first wife having died some nine years prior to his marriage to appellant. The testimony reflected that the parties had subsequently dated for several years, and had regularly dated for about a year, before their marriage. The record also shows that appellant had consulted attorneys on at least half a dozen occasions, and was thus familiar with the services afforded by lawyers. Yet, though aware of most of the properties owned by appellee, and though trained in the field of real estate—and though having had the opportunity to have the agreement examined by an attorney—and though knowing different attorneys, appellant executed the agreement, stating several times that she was not concerned about the value of his property, and was entirely satisfied upon his promise to leave the home to her and convey to her the two business properties. It therefore appears that the circumstances were such that Mrs. Hughes could reasonably have had, or acquired, a knowledge of the value of the properties before the agreement was executed; this being true, the agreement having been freely entered into, and no fraud being shown, we hold that this point is without merit.

We agree with appellant that the evidence does not justify the granting of a divorce. Appellee's proof consisted of his testimony that Mrs. Hughes had "nagged" him to convey property to her; that she had threatened to send him to a nursing home; that she had taken from the lockbox a dinner ring which he had given his first wife, a sack of gold coins (having a face value of over $100.00), had withdrawn $3,000.00 from their joint account in the bank, and had misrepresented the price of an automobile that he purchased for her.[2] It was also charged that on his second trip to Miami for a medical checkup, where he remained for six weeks, Mrs. Hughes never wrote or inquired about his welfare. As to the first allegation, there was no corroboration though Mr. S. C.

[2]A car owned by Mrs. Hughes prior to the marriage was traded in on an automobile, and appellee stated that appellant told him that an additional $900.00 would have to be paid, whereas $2,500.00 was required.

Bundy, a witness in behalf of appellee, testified that appellant mentioned to him several times that Hughes should deed her some property. With respect to the second contention mentioned, there was no corroboration. Mrs. Hughes admitted taking the ring, the coins, and withdrawing the $3,000.00.[3] Appellant stated that she took the ring because she was hurt and angry, Hughes having told her he could not afford to give her an engagement ring; she stated the money and coins were "insurance" because he had not made provision for her and she felt insecure, fearful that his daughter would prevail upon Hughes to "cut off" the bank account. She testified that this last actually did subsequently happen.[4]

There was no corroboration of the charge relative to the purchase of the automobile, and Mrs. Hughes stated that appellee helped pick out the car and that she wrote a check for the difference in his presence. Appellant said that at his suggestion, she did not go to Miami. The evidence reflects that he called her over the phone, wrote her at least twice, and sent an Easter card, and his daughter wrote a letter advising of his condition. Apparently Judge Hughes did not feel neglected or mistreated by her failure to be present; the letters written were friendly and affectionate, and upon his return from Miami, he brought appellant a handbag and treated her with affection.

The record is replete with evidence of the care given appellee by appellant during the marriage. Judge Hughes was first operated on for the removal of a tumor from his colon in May, 1969, and he remained in the hospital for several weeks, appellant staying in Miami with him. After returning to Benton, appellee suffered a setback and spent a month in the Missouri Pacific Hospital in Little Rock. Appellee admitted that appellant had been kind to him, had nursed him, had changed the dressings where he had a drainage of pus for a period of approximately nine months, had bathed him, had cleaned him

---

[3]She said Hughes told her to take the coins. The $3,000 was charged to her share of the joint bank account by the chancellor.

[4]The court found that Hughes did close out the account in the latter part of April, 1970.

up after bowel movements, had chauffeured him to doctors, and even cut up the food on his plate. Appellant testified that the drainage was quite severe and that many changes of clothing were necessary; that at one time there were as many as five changes per day of clothes and pajamas. It was also necessary that she attend him each time he urinated. From the record:

"Q. Well, was this the time or another time he would have to be waited on about the catheter?

A. Well, that was—he came home from the hospital with the catheter in.

Q. From Little Rock?

A. Yes, from the hospital.

Q. Would you have to attend him each time he urinated?

A. Well, I did because he couldn't clip it off and couldn't clip it on. When he got ready to go I had to go with him. When I attached the bag to it he disliked carrying a bag around with people seeing it so he would just clip the catheter off so each time he had to go to the bathroom then I had to go with him."

This involved going to public toilets:

"Well, I would just go stand outside the men's toilet and if somebody be going in there I asked if anybody in there, I would like to go see about my husband."

Appellant stated that this happened numerous times when they went out to eat, or when they would go to the doctor's office. Mr. Bundy, who was appellee's sole witness besides the daughter, admitted that he had gotten up before the Sunday School class eight days before the suit was filed seeking help for Mrs. Hughes in looking after her husband. He added "She is a lady of about 71

or 72 and I imagine it is hard for a lady that age to take care of anyone so I was trying to help both of them".

It definitely appears that appellee was in a good humor with appellant when he wrote the affectionate letters from Miami and returned home with the bag as a present. His daughter returned with him, and two days later (Tuesday) after some unfriendly conversation between the daughter and appellant, Mrs. Hughes left the home but returned on Friday. The following Monday Hughes instituted the suit.

From reading the record, it appears that difficulties commenced when Mrs. Davenport learned her father had deeded property that had been in the Hughes family for years to his wife, and the daughter admitted that she felt that Hughes property should stay in the Hughes family; that appellant was not entitled to receive these properties. This feeling of a daughter of his first marriage is understandable, but it appears that it contributed to the failure of the marriage under discussion. There is no evidence of quarrels between the parties, and numerous witnesses testified relative to the kind and considerate treatment of Hughes by appellant.

We do not think that the related facts establish that appellant offered such indignities to the person of appellee as to render his condition intolerable.[5] The chancellor himself commented that the grounds for divorce were "very slim" and "strictly on the border line".

In accordance with what has been said, we affirm the chancellor's holdings that the ante-nuptial agreement was valid; however, we hold that grounds for divorce were not established and that portion of the decree granting the divorce is hereby annulled and set aside. This means that appellant is entitled to maintenance from the date of the divorce decree to the date of appellee's death.

For his third point, counsel argues that the attor-

---

[5]Ark. Stat. Ann. § 34-1202 (Supp. 1969).

ney's fee allowed him as appellant's attorney was inadequate, but we are unable to say that, in setting this fee, the chancellor abused his discretion. Appellant's fourth point is only an alternative prayer and need not be discussed.

During the pendency of the action, the court had ordered maintenance for appellant in the amount of $400.00 per month, and this amount appears entirely reasonable. Since appellee is not entitled to a divorce, the case is remanded with directions to award appellant the sum of $400.00 per month as support and maintenance. during the period between the entry of the divorce decree (December 3, 1970) and the date of appellee's death (August 4, 1971). In all other respects the decree is affirmed.

Counsel for appellant is awarded an additional attorney's fee of $2,000.00 for services rendered in this court.

FOGLEMAN, J., not participating.