N. MARK KLAPPENBACH, Judge
Appellant Kathy Frazier Mays appeals the May 2017 order entered by the Pulaski County Circuit Court, probate division, finding that she failed to establish the invalidity of an antenuptial agreement. The parties to the 1995 antenuptial agreement were Kathy and Sedrick Mays. Sedrick died in June 2015. Kathy argues on appeal that the trial court's finding that the antenuptial agreement was enforceable against her is clearly erroneous and must be reversed. We disagree with her argument and affirm.
The appellate court reviews probate proceedings de novo but will not reverse the decision of the probate court unless it is clearly erroneous. Seymour v. Biehslich , 371 Ark. 359, 266 S.W.3d 722 (2007). A finding is clearly erroneous when, although there is evidence to support it, the appellate court is left on the entire evidence with the firm conviction that a mistake has been committed. Id. We must defer to the superior position of the lower court sitting in a probate matter to weigh the credibility of the witnesses. Patton v. Fulmer , 2016 Ark. App. 260, 492 S.W.3d 512. To the extent that the appellate court reviews questions of law, that review is de novo. Estate of Taylor v. MCSA, LLC , 2013 Ark. 429, 430 S.W.3d 120 ; Broussard v. St. Edward Mercy Health Sys., Inc. , 2012 Ark. 14, 386 S.W.3d 385.
Arkansas law has long recognized the validity of premarital[1] agreements. See , e.g. , Oliphant v. Oliphant , 177 Ark. 613, 7 S.W.2d 783 (1928). In Arkansas, *476 a premarital agreement is valid if it was freely entered into and is free from fraud and not inequitable. Arnold v. Arnold , 261 Ark. 734, 553 S.W.2d 251 (1977) ; Gooch v. Gooch , 10 Ark. App. 432, 664 S.W.2d 900 (1984). Parties contemplating marriage may, by agreement, fix the rights of each in the property of the other differently than established by law. Banks v. Evans , 347 Ark. 383, 64 S.W.3d 746 (2002) ; Hughes v. Hughes , 251 Ark. 63, 471 S.W.2d 355 (1971). In determining the fairness or equity of the agreement, the court may consider the parties' respective stations in life, their experiences and educations, and their knowledge of financial and legal matters. Banks , supra ; Gooch , supra.
At issue here is the enforcement of a premarital agreement, governed by Arkansas Code Annotated section 9-11-406, which provides in relevant part as follows:
(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:
(1) that party did not execute the agreement voluntarily; or
(2) the agreement was unconscionable when it was executed and, before execution of the agreement, that party:
(i) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
(ii) did not voluntarily and expressly waive after consulting with legal counsel, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
(iii) did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.
....
(c) An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law.
This law places the burden on the party contesting the agreement to prove its invalidity. Branch v. Branch , 2016 Ark. App. 613, 508 S.W.3d 911. To prevail under this statute, it was Kathy's burden to establish either that she did not execute the agreement voluntarily, or that all of the following existed: (1) that the agreement was unconscionable; (2) that, before the execution of the premarital agreement, she was not provided a fair and reasonable disclosure of Sedrick's property or his financial obligations; (3) that, before the execution of the premarital agreement, she did not voluntarily and expressly waive, after consulting with legal counsel, in writing, any right to disclosure of Sedrick's property or financial obligations beyond the disclosures provided; and (4) that, before the execution of the premarital agreement, she did not have, or reasonably could not have had, an adequate knowledge of Sedrick's property or financial obligations. Id. at 3-4, 508 S.W.3d at 914-15.
With these principles in mind, we examine the facts of this case. Sedrick Mays was the owner and operator of Kitchen Express, a restaurant in Little Rock, Arkansas. Sedrick graduated from high school, but he did not go to college. In 1993, Kathy's aunt introduced her to Sedrick at the restaurant. Kathy had gone to college, and she was trained to be a registered nurse. The two began dating in December 1993.
Kathy moved back to her hometown in Camden, Arkansas, to live with her mother, but she and Sedrick alternated driving between Camden and Little Rock to visit *477 one other.[2] Kathy would stay with Sedrick at his house on West 31st Street in Little Rock, near the restaurant. The two eventually planned to marry, setting the date for December 30, 1995. On December 27, 1995, the two applied for a marriage license in Pulaski County. Sedrick was 34 years old, and Kathy was 31 years old; they signed as "Sedrick Louis Mays" and "Kathy G. Frazier," and their signatures were verified by the county clerk.
Willie Bradley would later testify that he came to the restaurant on December 29, 1995, to visit his cousin "Sed." The restaurant was open. Willie stated that this was the first time he met Kathy and that Sedrick introduced her as his fiancée. Willie was there when Sedrick signed the document in front of a notary, Michael Craig. Willie said that he and another witness, Angela Peterson, whom he did not know, signed the document as well. He said that Kathy did not say anything, nor did he hear any conversation between Sedrick and Kathy about the document, but he did not witness Kathy behave in any way to make him think she was not voluntarily signing the document. Willie witnessed the notary place the physically imprinted, raised notary seal on the document. Willie stated that the date on the document, December 29, 1995, was already written on the document and that it was the date that everyone signed. Willie admittedly did not read through the document; the signature pages were open for him. In response to the trial court's question, Willie stated that "[t]he only document that I saw was the part that we signed. It was just two pages. As far as I can remember, there were just two pages. The two pages we signed. There probably were some more there, but I didn't really pay enough attention to it." On cross-examination, Willie agreed that Sedrick had loaned him money in June 1995, but Willie said that he paid Sedrick back in a week's time and that he was not asked to sign the document in exchange for forgiveness of debt. Willie did not go to Kathy and Sedrick's wedding.
The "Antenuptial Agreement" was eleven pages long, and in it, Sedrick and Kathy agreed that they intended, in anticipation of marriage, to fix and determine their rights and claims to the estate and property of the other person by reason of marriage. The agreement recited that both of them had "disclosed to the other the nature and extent of their various property interests and all of their sources of income, both earned and unearned"; that each of them had "fully acquainted" the other of his or her "means and resources" and had "informed" the other "in detail" of his or her "net worth"; that they accepted the agreement's provisions "in lieu of all rights which they would otherwise acquire by reason of the marriage in the property or estate of each other"; that "each party has been fully informed of the financial condition of the other"; that both of them "clearly understand and consent to all provisions hereof" and "had the benefit of the advice of an attorney and counselor of their own selection" and entered the agreement "freely, voluntarily, and with full knowledge." The agreement recited that this document contained "the entire understanding of the parties."
The agreement recited that each party would retain his or her own premarital property, including "real, personal or mixed" property, free from any and all rights or claims of the other party, including through "inheritance." The agreement set forth that the "only exception to this Agreement" would be the real property located at 11025 Dogwood Cove in Little Rock, which they had "purchased jointly"
*478 in November 1995, before their marriage. The agreement specified particular premarital assets located in Little Rock belonging to Sedrick, including 2805 Cross Street; 4624 West 31st Street; portions of four particular lots in Riffel and Holder's Second Edition; "Kitchen Express" located at 4600 Asher Avenue; the "Bread Store" at 4612 Asher Avenue; the "House" at 4617 West 31st Street; and a "vacant lot" at 4624 Asher Avenue in the Oakhurst Addition. Kathy specifically agreed that Sedrick would have unfettered control and ownership of his premarital property "including all profits and increases in value from said real property." Each party waived and released any interest that might exist in those assets "including any interest, improvements, increases in value and/or profits derived from any real property during the course of the marriage." Each party agreed to "abolish spousal support obligations." The agreement was to become effective at the time of their marriage.
The last three of the eleven pages contained the signature pages. The ninth page contained the notary's two acknowledgments that the parties had executed the document, one for Kathy and one for Sedrick. Pages ten and eleven contained the signatures of "Sedrick Mays" and "Kathy Frazier" as well as witnesses "Willie C. Bradley" and "Angela Peterson," which were all verified by the notary. Just below the signature of "Kathy Frazier" are the witnesses's statements that they are witnesses to the "Antenuptial Agreement" that was "executed by Kathy Frazier[.]"
Kathy and Sedrick married on December 30, 1995, in a small town a few miles away from Camden, Arkansas. The parties eventually sold the house on Dogwood Cove and bought a house at 17 Reynard Estates Drive in Little Rock. In July 2013, Sedrick filed a complaint for divorce from Kathy. In response to Kathy's pleading that sought spousal support, Sedrick alleged that "the parties are bound by a valid, executed antenuptial agreement that abolishes spousal support obligations." The parties subsequently reconciled, and the divorce matter was dismissed in March 2014. Kathy worked as a nurse manager for Centers for Youth and Families, while Sedrick continued to run the restaurant.
Sedrick went missing for a few days in June 2015, and his body was found in Hensley, Arkansas, on June 20, 2015. Sedrick, who was then 53 years old, did not have a last will and testament. On June 24, 2015, Kathy filed a petition to be appointed administratrix of Sedrick's estate, which was granted.
In August 2015, Sedrick's ten siblings filed a petition seeking to remove Kathy as administratrix and to have an accounting and inventory conducted. The siblings presented the document titled "ANTENUPTIAL AGREEMENT" as the basis for asserting the following allegations: that Sedrick had specifically informed Kathy of his ownership of Kitchen Express and other real properties and that she had waived any and all interest in Sedrick's premarital assets; that Kathy had changed the locks on the restaurant and had the restaurant's safe drilled opened and emptied; that thereafter Kathy intentionally excluded the siblings from any management or administrative functions of the business; and that Kathy intentionally failed to disclose the existence of the antenuptial agreement and misled the court in order to prevent Sedrick's rightful heirs from receiving his premarital property. In response, Kathy argued that (1) she did not knowingly and voluntarily execute the antenuptial agreement; (2) she did not execute the document before marriage; and (3) enforcement of the agreement against her would be unconscionable.
*479 The matter was presented in a February 2017 bench trial. Kathy explained that after dating for about two years, she and Sedrick planned to get married. She verified her and Sedrick's signatures on their application for a marriage license, dated December 27, 1995. Kathy said that she was not in Little Rock, though, on December 29, 1995, because she was in Camden getting ready for the wedding, getting her nails done, meeting with the church decorator, and taking her maid of honor for a dress fitting.
Kathy denied signing any antenuptial agreement, but if she did sign this one, it was not knowingly and voluntarily. She said that if Sedrick had asked her to sign this agreement (which she had read before trial), she would not have married him; if she was going to enter into such an agreement, she would have consulted with an attorney.
Kathy stated that she knew that Michael Craig was a CPA who did accounting for Sedrick and that Willie Bradley was one of Sedrick's relatives, but she did not know who Angela Peterson was. She added that she did not know about a lot of Sedrick's assets, though she knew he owned Kitchen Express and had visited him at his home on West 31st Street. She knew about his vehicles but not about their worth; she was unaware of Sedrick's investments and debts. When asked what personal property that she thought Sedrick had not disclosed to her before marriage, Kathy replied twenty shares of Walmart stock, which would have been valued at approximately $211 at that time, and his clothes and furniture.
Kathy stated that she did sign a single page of paper at the restaurant a week after they returned from their honeymoon. She testified that Sedrick had already signed the piece of paper, that he told her that she was a witness "to evidence a debt that Willie owed to Sedrick," that she did not recall seeing Michael Craig there, and that Willie and a female were there. Kathy said that she signed using her maiden name, even though it was after the wedding, noting that the document already had "Frazier" typed on it. She said, "I didn't really read this document in its entirety. I saw Sedrick's name, he asked me to sign it, I signed it. And that was the end of that.... [T]here were two documents, that's my position, there were just two pages." She acknowledged, though, that on the page below her signature were the words "Antenuptial Agreement."
Kathy denied ever knowing about the antenuptial agreement until after Sedrick's death. She denied having read anything about it in the divorce papers. She said that she did not ever work at Kitchen Express during the marriage but that Sedrick did give her keys to the restaurant, and she handled a lot of office duties. She said that in 1997 they borrowed roughly $225,000 to renovate and expand the restaurant, but she would not have put her name on that loan had she known that she did not have any interest in Kitchen Express. She said that they also borrowed $55,000 during the marriage to buy real estate near the restaurant and used it as a banquet room that could be rented out, which became her sole property at his death. She said that they owned household furniture valued at $64,000 that was now hers.
Kathy explained that when Sedrick died, she had the restaurant locks changed because Sedrick trusted his sister Jacqueline with the keys, but she did not. Kathy said it cost $400 to have the restaurant's safe drilled. Jacqueline had the combination, and Kathy believed the safe held "money and papers." Kathy said that *480 she received life insurance proceeds[3] after Sedrick's death and that she sold Sedrick's boat for $3,800 to pay for his headstone. She said that after Sedrick died, his vehicle was totaled,[4] and she received the insurance proceeds. Kathy received Sedrick's Edward Jones retirement investment account worth over $300,000, and she retained ownership of their home at Reynard Estates. Kathy told the court that she did not think it would be fair to permit the Kitchen Express value that she helped to create to go to Sedrick's brothers and sisters when they never made an investment in the restaurant like she did.
Kathy's mother, Margaret Frazier High-Smith, testified that her daughter got married on Saturday, December 30, 1995. Margaret said that the day before, on Friday, she and Kathy were busy with wedding preparations, including meeting with the maid of honor for a dress fitting, getting their hair and nails done, meeting with the church decorator, getting ready for the rehearsal dinner, and staying overnight at their Camden home, with no time to drive up to Little Rock. She said that Kathy was living with her and working at a Camden nursing home before her marriage but that Kathy would occasionally go back and forth between Camden and Little Rock.
A forensic document examiner, Grant R. Sperry, was called to testify about his expertise in identifying handwriting. He used comparative samples of Kathy's handwriting, explained their similar cumulative characteristics, and opined that Kathy "probably" wrote the signature on the antenuptial agreement, meaning that his opinion was with a "relatively high degree of certainty." He testified that there was no evidence of page substitution, manipulation, deletion, or insertion; that the font and impact of the print on the pages was consistent with machinery used in 1995; that there were no notable differences in the composition of the eleven pages of paper; that rust around the staple holes indicated age and/or storage; and that all the signatures except the notary's made indentations to the next page.
Willie testified at the bench trial in line with what has been heretofore described. In short, he testified that he was present on December 29, 1995, at the restaurant with Sedrick, Kathy, and Angela, when they all signed the document and had their signatures notarized.
Fredrick Mays, Sedrick's older brother, testified that he came to the wedding in 1995 and that Sedrick showed him the agreement before the wedding. He said that Sedrick had the agreement with him on that day. Fredrick said that he and Sedrick had previously discussed the agreement "to protect our family restaurant" and that Sedrick "had previously said he was going to have it done." That was why Fredrick had "pulled Sed to the side" before the wedding to ask if he had gotten "the business taken care of," and Sedrick confirmed that he had.
Jacqueline Mullins, Sedrick's youngest sister, testified that she had previously been the office manager at Kitchen Express but that after Sedrick died, Kathy demoted her. Jacqueline said that Sedrick trusted her with the keys and the combination to the safe but that Kathy did not. Jacqueline testified that Michael Craig and Sedrick's lawyer, Horace Walker, were no longer alive but that the lawyer had prepared *481 the premarital agreement, that it was what Sedrick wanted, that she knew about the agreement before his death, and that the agreement was "important to the family." Jacqueline stated that she was qualified to run the restaurant and that she was also "ready, willing, and able" to take over the administration of her brother's estate.
Rodney Williams, Sedrick's nephew, testified that Sedrick had told him about the premarital agreement and that it was found in the trailer on Sedrick's property in Hensley, Arkansas, where he was found deceased.
After hearing arguments of counsel, the trial court asked for posttrial briefs and for proposed findings of fact and conclusions of law. The trial court then took the matter under advisement.
In May 2017, the trial court filed the order that is on appeal. Therein, the trial court considered Kathy's contentions that she did not knowingly and voluntarily execute the agreement; that she did not execute the agreement until after the marriage; and that the agreement was unconscionable. In pertinent part, the trial court found that (1) Kathy and Sedrick executed the agreement on December 29, 1995, with two witnesses present; (2) Kathy failed in her burden to prove that she did not voluntarily execute the agreement; (3) Kathy's testimony was not credible; (4) Kathy and Sedrick had equal bargaining power at the time of the agreement's execution; (5) Kathy's failure to read the agreement did not render it unenforceable; (6) Kathy failed to prove that she was not given a fair and reasonable disclosure of Sedrick's property or financial obligations or that she did not have or could not have had an adequate knowledge of the property or financial obligations of Sedrick; (7) the agreement listed all of Sedrick's real property owned at that time and referred specifically to the "Kitchen Express" property; (8) Kathy was aware that Sedrick owned Kitchen Express at the time of the agreement's execution; (9) Sedrick disclosed the bulk of his assets in the agreement, and Kathy was familiar with the property he owned before the marriage; (10) Kathy complained of lack of disclosure of Sedrick's personal property, vehicles, and Walmart stock, but those were cumulatively of "minimal value" when compared to the property he did disclose; (11) Sedrick provided a fair and reasonable disclosure of the property he owned before the marriage, and Kathy had an adequate knowledge of his property; (12) the agreement was valid and enforceable and precluded Kathy from any rights to Sedrick's premarital property; and (13) Kathy was removed as administratrix, and Jacqueline was appointed as administratrix subject to her acceptance. This timely appeal followed.
On the issue of voluntariness, we hold that the trial court did not clearly err. Kathy's argument appears to be that she was tricked into signing only the signature pages, that she was deceived into believing that she was witnessing a promise by Willie to repay a debt to Sedrick, and that she could only have been asked to do this after the marriage and not before she married. What Kathy is asking us to do, in essence, is to reweigh the evidence in her favor and to find her to be credible, which is not the function of the appellate court. See In re Estate of Davidson , 310 Ark. 639, 839 S.W.2d 214 (1992) ; Minton v. Minton , 2010 Ark. App. 310, 374 S.W.3d 818.
The trial court had before it the testimony of Willie Bradley who confirmed that the execution of this document took place on the day before the wedding, with Sedrick, Kathy, Angela, and the notary present; Willie stated that Sedrick introduced *482 Kathy as his fiancée; the document bore the notary seal pressed through each of the final pages; the page on which Kathy's signature appears contains the words "antenuptial agreement" just below her signature; a document examiner provided expert testimony supporting a finding that this was Kathy's signature; and even Kathy acknowledged that she probably signed something with these people present, although she disputed the document's length, purpose, and the timing of its execution. The trial court obviously believed that the entire agreement was present on the date it recites that it was signed. The trial court clearly put the responsibility on Kathy, an adult college-educated person, for any alleged failure to read or comprehend this agreement as a choice made at her own peril. Therefore, we cannot say that the trial court clearly erred in concluding that Kathy failed to prove that she involuntarily executed the agreement.
On the issue of unconscionability, we have reviewed this de novo and hold that there is no error. The issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law. Ark. Code Ann. § 9-11-406(c). An act is unconscionable if it affronts the sense of justice, decency, and reasonableness. Gulfco of La., Inc. v. Brantley , 2013 Ark. 367, 430 S.W.3d 7 ; Baptist Health v. Murphy , 2010 Ark. 358, 373 S.W.3d 269. When assessing whether a contractual provision is unconscionable, the courts review the totality of the circumstances surrounding the negotiation and execution of the contract. Jordan v. Diamond Equipment & Supply Co. , 362 Ark. 142, 207 S.W.3d 525 (2005). Two important considerations are whether there is a gross inequality of bargaining power between the parties and whether the aggrieved party was made aware of and comprehended the provision in question. GGNSC Holdings, LLC v. Lamb ex rel. Williams , 2016 Ark. 101, 487 S.W.3d 348.
The trial court found that these parties had equal bargaining power. Sedrick was a businessman with a high school education; Kathy was a college-educated licensed nurse; both were in their thirties; the parties dated approximately two years before their marriage; and both had their own assets before their marriage. Notably, the antenuptial agreement was mutual in that both parties were precluded from having any rights to any property interests of the other party that existed prior to marriage. The agreement disclosed Sedrick's premarital real estate with particularity. This antenuptial agreement does not in any way affront the sense of justice, decency, and reasonableness. Thus, we hold that Kathy failed to prove that this agreement was unconscionable. This renders moot any discussion about the three additional statutory factors that Kathy was required to prove along with unconscionability. Nonetheless, we hasten to add that the trial court did not clearly err in finding that Kathy had, or reasonably could have had, an adequate knowledge of Sedrick's property or financial obligations.
In summary, we hold that the trial court did not clearly err in finding that Kathy failed to prove that she involuntarily executed the antenuptial agreement or that the agreement was unconscionable. For these reasons, we affirm the trial court's order.
Affirmed.
Harrison and Brown, JJ., agree.

The terms "antenuptial" and "premarital" are synonymous, see Ark. Code Ann. § 9-11-401 (Repl. 2015), and we use those terms interchangeably in this opinion.

The driving distance between Camden and Little Rock is approximately 100 miles.

One exhibit listed Kathy as the beneficiary of life insurance policies with a face value exceeding one million dollars.

Apparently, Sedrick's body had been in the vehicle decomposing for some days before it was found, which left a persistent unpleasant odor inside the vehicle.