W. B. WYLIE et al *v.* Lerlean H. WYLIE

5-5329                                     459 S. W. 2d 127

Opinion delivered November 2, 1970

*Jake Brick* and *Rieves & Rieves,* for appellants.

*Hale & Fogleman,* for appellee.

Carleton Harris, Chief Justice. A. B. Wylie, 68 years of age, a resident of Crittenden County, whose first wife died in March 1957, married Lerlean Hunsaker, appellee herein, who was 54 years of age, on November 29, 1958. They had been engaged to be married for about two months prior thereto, and a few days before the wedding, Mrs. Hunsaker came down to Arkansas from New York. On the day before the ceremony, Wylie told appellee that he desired that she sign a document and they went to his attorney's office late that afternoon. There, an antenuptial agreement was signed. Under the terms of the contract, appellee agreed that upon the death of Wylie, she would receive $50,000 which would be in lieu of all claims, rights, or interests of any nature she might have against the estate of

Wylie. They lived together until February 3, 1968, at which time Wylie died testate, leaving his wife surviving him, two brothers, a sister, and several nieces and nephews. Various relatives, together with a foster daughter and her husband, and also some of his first wife's relatives, were beneficiaries under the terms of his will. The will was admitted to probate and appellee exercised her option to take against the will. Suit was instituted attacking the validity of the antenuptial agreement and seeking to have same held void and of no effect. After a rather lengthy trial, the court, stating that the evidence reflected that Wylie's net worth at the time of the agreement was in excess of $475,500.00 found the agreement void, and canceled, set aside, and held it for naught. From the decree so entered, appellants, who include the executors of the estate, and several beneficiaries, bring this appeal. For reversal, it is simply asserted that the decision of the court was contradictory to the law, and that it was not supported by the preponderance of the evidence.

The law in this state on this subject, which is in accord with the general rule, has been settled for a long number of years. In *Davis* v. *Davis,* 196 Ark. 57, 116 S. W. 2d 607, we said:

"So it will be seen that the principle is announced in all of our cases, that in order for antenuptial contracts to be valid, they must be freely entered into, must not be unjust or inequitable and they must not be tainted with fraud. It appears to us that the contract in this case fails to meet these requirements in that it is an unjust and inequitable agreement."

Quoting an Illinois case, *Achilles* v. *Achilles,* 151 Ill. 136, 37 NE 693, we stated:

"But, in the absence of clear and satisfactory proof, it is not to be presumed that she would, with full knowledge of all the circumstances, have entered into such a contract. Parties to an antenuptial contract occupy a confidential relation toward each other. (citing

cases) While they may lawfully contract with each other where there is full knowledge of all that materially affects the contract, yet where the provision secured for the intended wife is disproportionate to the means of the intended husband, it raises the presumption of designed concealment, and throws the burden upon those claiming in his right to prove that there was full knowledge, on her part, of all that materially affected the contract. (citing cases) The burden here was, therefore, upon appellants to prove, by satisfactory evidence, that appellee had knowledge of the character and extent of her husband's property, and of the provisions and effect of this instrument, or, at all events, that the circumstances were such that she reasonably ought to have had such knowledge at the time this instrument was executed."

This holding was reiterated in *Burnes* v. *Burnes, Administrator*, 203 Ark. 334, 157 S. W. 2d 24. The rule is thus stated, and the only matter for determination is whether the proof offered in this case supports the finding of the chancellor. Without any hesitation whatsoever, we hold that the evidence is more than ample to support the view taken by the trial court, *viz*, that the value of Mr. Wylie's properties, and his financial status, were far in excess of the figures given to the present Mrs. Wylie at the time the antenuptial agreement was entered into; that she had no knowledge to the contrary and fully depended upon the statement of her husband-to-be in consenting to enter into the agreement. Since the law controlling the issues presently before us has long been in effect, this opinion has no value as a precedent, and since we are of the view that the evidence overwhelmingly supports the position of appellee, there is no need to greatly detail the evidence. Appellee had lived at Marion for a short time, teaching school there from 1926 to 1928. In subsequent years, she would see the Wylies on short visits to Marion during the summer. Sometime after the death of Mrs. Wylie, appellee visited a friend in Crawfordsville, stopped by Wylie's office to speak to him, and he invited appellee and the persons whom she was visiting

to have dinner with him. Appellee and Wylie exchanged Christmas cards and subsequently he called and asked if she would come down to Marion during the summer. Appellee was living in New York at the time, employed by the American Petroleum Institute. Wylie frequently called over the phone and they became engaged to be married. According to Mrs. Wylie's testimony, she returned to Arkansas for the wedding, and on the day before this event, he asked if she would sign a document and they went to the office of his attorney. She stated that the attorney did not represent her, had never drafted any document for her, and she had not given him any information with reference to her own property. This property consisted of $692.00 worth of stock in Massachusetts Investors Trust. The witness said that she had no idea of how much real estate Mr. Wylie owned, nor did she have knowledge as to the personal property he owned in the way of investments, or which might be held in banks or lock boxes. She testified that she accepted entirely his statement that his total worth was $200,000; she had been out on the main farm, had seen the store buildings, gin, and cattle, but had no idea of the value of these properties; there were some farms that she had not seen. According to the testimony, Wylie gave her approximately $300.00 a month for household expenses and bills; he was generous to her, to members of his family, and to relatives of his first wife, making both large and small gifts. At the time of his death, she had not the slightest idea as to the value of his properties, nor the extent of his holdings, and it was only after his death that she learned that he was actually worth a great deal more than she had thought.

There is no testimony to the effect that Mrs. Wylie had knowledge of her husband's actual worth, and the only evidence of any figure except the $200,000, was given by Mollie Naylor, who at the time the agreement was entered into, was employed as secretary to Mr. Wylie's attorney. This witness testified that after the contract had been executed, and the Wylies and her employer were standing near her desk, the latter stated that the $200,000 was an estimate of Wylie's worth, but he might

be worth nearer $300,000. Mrs. Wylie said that if such a statement were made, she did not hear it.

It is argued by appellants that appellee signed the agreement with full understanding of all relevant facts, and to say otherwise would ignore her education, her business qualifications, her acquaintance with the decedent for a number of years prior to the marriage, her acquaintance with people who knew him and his business connection, and the general reputation he bore in the community. We do not agree that there is merit in this argument for we find nothing in her education or business qualifications that would qualify her to make a determination of the value of the Wylie properties, even if she had full knowledge of the properties he owned. There is not one line of evidence in this record that she either knew, or made inquiry, about his financial worth or business connections and, as stated by appellee, appellants could have painted a dark picture of Mrs. Wylie, if she had discussed, or inquired, as to the extent and value of his holdings with neighbors and acquaintances. For a discussion of the argument that she should have known, from circumstances, the extent of his wealth, see *In Re Flannery's Estate* 173 A. 303. In fact, the absence of any proof by appellants along this line strongly supports her position that she entered into the marriage and agreement in good faith. Admittedly, she had no doubts concerning his ability to support her, and knew that he had lived comfortably, and had a substantial livelihood. But, of course, this evidence is really of no value in determining whether she was acquainted with his actual worth, even if she had considered him "wealthy", for to many persons, probably the vast majority, a man worth $200,000 is "wealthy".

Other circumstances indicate that Mr. Wylie did not act in good faith with appellee, and endeavored to prevent her from knowing his actual worth. While only circumstances, they do contribute to the overall picture. For instance, though Wylie had been conferring with his attorney for about two months while the instrument was being drafted, several drafts being made, at

the time the Wylies went to the office of his attorney, she was first left in the reception room for "a while" during which time he went in and conferred with the lawyer; also, when Mr. Wylie was a patient at the Baptist Memorial Hospital in Memphis in 1960, the evidence reveals that Mr. Wylie sent for his attorney and his secretary and requested them to come to the hospital relative to preparing a will. When they arrived, Mrs. Wylie was present, but her husband required that everyone be out of the room except the lawyer and secretary while he discussed the will with them. Appellee never saw the will nor had knowledge of its contents until after his death. It was also established that during the marriage, large gifts of cash were made to relatives, but no checks were given for these amounts, thus clearly supporting appellee's contention that Mr. Wylie transacted a lot of business with cash. In fact, Wylie's own accountant testified that Wylie's total withdrawals from banks for the year 1961, 1962, and 1963, were less than the amounts of gifts made by cash, the amount of withdrawals in 1961 being $2,314.00, $2,150.00 in 1962, and $1,877.00 in 1963, and nothing is shown for normal day to day living expenses for Wylie and appellee.

What was the proof as to Wylie's actual worth at the time of the execution of the agreement? C. B. Senhausen of West Memphis, a resident of Crittenden County, since 1941, who had been engaged in real estate appraisals and insurance since that time, testified on behalf of appellee. Mr. Senhausen had been employed for the purpose of making an appraisal of the real estate owned by Wylie. The testimony of this witness is very impressive, leaving one with the definite impression that he was thoroughly familiar with most of the Wylie property; he seemed entirely fair, and in fact, somewhat conservative, in the values reached. Senhausen testified that there were six separate farms of various acreages, a gin plot on which a gin was located, a home in Marion, a dwelling in Memphis, and three vacant lots in Marion. The witness expressed his familiarity with the type of soil, land drainage, and other

characteristics of the land pertinent to a proper evaluation. He testified in detail concerning all of these properties, and mentioned numerous sales of real estate that he found comparable to the lands under investigation. He described the improvements with thoroughness and, as stated, was impressive in his apparent knowledge of the facts mentioned. Senhausen estimated the value of the farm lands with improvements, the gin stock, the gin company, the house and lots, the house in Memphis, and the vacant lots in Marion to be worth $454,986.96 in 1958, the year that the antenuptial agreement was executed.

Harry F. Dodge, a certified public accountant for sixteen years, also testified on behalf of appellee, and he carefully detailed the results of his investigation of the records of Wylie, the assets reflected in the records, and assets otherwise established as belonging to Wylie. He analyzed the records to show, in his opinion, the actual totals of funds available to Wylie for living expenses, and the amount of increase in the estate from the date of the antenuptial contract until Wylie's death. Dodge testified that Wylie's net worth in 1958 was $580,096.05.

Raymond L. House, a public accountant of Memphis, not a certified public accountant, testified on behalf of appellants and stated that he first started keeping books and records for Mr. Wylie in 1957, and continued doing so until Wylie's death. From 1964 until the time of his death, Wylie was House's sole employer, and thereafter, his sole employer was the Wylie estate. It might be said that the testimony of this witness was not nearly so impressive as that of the persons heretofore mentioned, and the basis of his values is somewhat questionable. For instance, it appears that he had been entirely willing to make or change book entries with no more reason than the oral instructions given to him by Wylie. Some of his testimony relative to exhibits prepared at the request of appellants is rather confusing, and he took his real property evaluation from tax records, though the person who furnished these records, A. E. Miller, testifified that he (Miller) didn't

think that the records represented the market value of the Wylie lands in 1958. House testified that Wylie's net worth in 1958 amounted to $277,581.66. The testimony of the witness was somewhat weakened by his misrepresentation of his qualifications.[1] Although House was requested by his attorney (at the behest of appellee's attorney who wanted to further cross-examine House) to return to court, he never did do so.[2]

A. E. Miller, County Assessor, testified that the appraised value of the lands and improvements in 1958 was $114,770.00. As previously stated, the witness said that he did not believe that this appraisement represented the fair market value of the property at that time, it being his feeling that the figure was too low.

Summarizing, the law requires that a man and woman, as they enter into the status of husband and wife, employ frankness and candor in dealing with each other. This, of course, is as it should be, for in

---

[1]House testified that he was a public accountant, and that there was no difference in a public accountant and a certified public accountant in Tennessee; that each had to pass the same examination. He stated that he took the examination, and specifically said that he was not admitted on a waiver. Subsequently, appellee offered into evidence a certified copy of House's application for license to practice as a public accountant, submitted by House to the State Board of Accountancy. This exhibit reflects that House was admitted by waiver of examination provided for under Section 19, Chapter 231, Public Acts of 1955 (Tenn.), this legislation containing provisions commonly referred to as a "Grandfather Clause".

[2]Appellants' counsel was told by the witness that his wife's father had died, and that he (House) was under the care of a doctor. Appellants' attorney suggested taking the deposition of the witness on Monday morning, and he told the court that he was under the impression that House had agreed to that time. House called during the afternoon and stated that it was impossible for him to be there since he had already made other arrangements, and no different time was suggested. Counsel stated that House had indicated that he was under a doctor's care, and "was highly emotional in regard to the prolonged cross-examination". Counsel also stated that Mrs. House had said that her husband was anemic and was being given sedation or treatment of a type that affected his thinking. Under these circumstances, the attorney agreed that a discovery deposition, which had been taken from House could be offered, insofar as it was applicable to impeachment or contradiction.

the very nature of things, the successful marriage is based upon complete confidence and trust between the parties. We agree with the Chancellor that the evidence shows that this course was not followed by Mr. Wylie at the time of the execution of the antenuptial agreement. We likewise agree that other facts and circumstances support this conclusion, and we are in accord with the Chancellor in finding the evidence presented by appellee relative to Mr. Wylie's worth, to be more convincing, more understandable, and more reasonable.

The decree of the Crittenden County Chancery Court is thus affirmed.

It is so ordered.

FOGLEMAN, J., disqualified.