### ARVIL W. DENNIS *v.* ROBERT LEE YOUNTS, MARY ELLEN KING AND JOHNNY MAY HOLLAND

5-5641                                    472 S.W. 2d 711

Opinion delivered November 8, 1971

*Moses, McClellan, Arnold, Owen & McDermott,* for appellant.

*Terral, Rawlings, Matthews & Purtle,* for appellees.

CARLETON HARRIS, Chief Justice. This appeal involves the validity of a certain special warranty deed given by appellant, Arvil W. Dennis, on July 19, 1962, to his wife. Mr. and Mrs. Dennis had been divorced twice and had remarried twice, the last divorce occurring in 1947, and the last remarriage on December 8, 1948. On September 7, 1959, the Dennises entered into a contract and agreement to purchase the real estate, here in litigation, from Mrs. Ludie M. Gipson.[1] Appellant and his wife took possession contemporaneously with the execution of the agreement and continued to live together on the property as husband and wife until sometime in the late winter or early spring of 1962, at which time they separated. Thereafter, on July 19, 1962, appellant executed

---

[1] While the contract is dated September 7, 1959, the signing of the contract before a Notary Public occurred on May 20, 1960, but this fact has no significance here.

a special warranty deed to his wife conveying the property to her. Sometime in 1964, the appellant and his wife resumed cohabitation as husband and wife and continued to live together on this property until the death of Mrs. Dennis on December 29, 1967. Mrs. Dennis was the mother of two children by a previous marriage, Robert Lee Younts and Johnny May Holland, and Mr. and Mrs. Dennis were the parents of one child, Mary Ellen King. In September, 1970, Dennis instituted suit against these three persons alleging that he was in possession of the property (by and through a tenant), and had made improvements on same and paid all taxes. It was asserted that the deed, heretofore mentioned, was given by him to his late spouse as a property settlement with the understanding that she would later institute divorce proceedings against him; that this was never done, and the parties subsequently effectuated a reconciliation and resumed the marital relationship. It is asserted that after the death of Mrs. Dennis, appellees (the children named above) made claim to the property, and it was prayed that title to the premises be quieted and confirmed in appellant. On trial, the court held contrary to this contention, finding that Younts, Holland, and King, as sole heirs at law of Mrs. Dennis, were the owners of the property and entitled to immediate possession. From the decree so entered, appellant brings this appeal[2]. For reversal, it is urged that the chancellor erred in holding that the deed was not cancelled by the subsequent reconciliation and cohabitation of Dennis and his wife, and further that the court erred in not permitting certain testimony offered by appellant.

The general rule in the matter at hand is set out in *Carter* v. *Younger*, 112 Ark. 483, 166 S. W. 547, where this court said:

"Where the parties to a valid separation agreement afterward come together, and live together as husband and wife, where their conduct toward each other is such that no other reasonable conclusion can be indulged than that they had set aside or abrogated their agreement of

___

[2]Other findings relating to personal property were made, but these are not under attack.

separation, then such agreement should be held as annulled by the parties to it, and their marital rights determined accordingly."

Other cases dealing with reconciliation following property settlements are *Sherman* v. *Sherman,* 159 Ark. 364, 252 S. W. 27, *Simpson, Administrator* v. *Weatherman,* 216 Ark. 684, 227 S. W. 2d 148, and *Ward* v. *Ward,* 249 Ark. 1001 (1971), 463 S. W. 2d 90. In all of these cases, a property agreement was entered into between the parties in contemplation of separation or divorce. In *Carter* v. *Younger, supra,* which is actually the strongest case offered in support of appellant's argument, the opinion reflects that Younger and his wife, while husband and wife, but living apart from each other, entered into an agreement of separation; among other things it was stipulated in the agreement that in consideration of several covenants of the wife, one consideration being the payment of a sum of money, Mrs. Younger released her husband from any claim or obligation for her support or maintenance and also released or relinquished any right or claim of dower. Upon the death of Younger, Mrs. Younger sought her dower rights, though she admitted the execution of the aforesaid agreement. However, she offered proof that the agreement had been abrogated, and this court held that the evidence (though not mentioning what the evidence consisted of) was sufficient to warrant a finding (by the jury) that the contract had been abrogated and the parties had been reconciled and had resumed the marital relationship.

In *Sherman* v. *Sherman, supra,* Sherman and his wife entered into a written agreement of separation whereby each took certain property, the consideration being that each gave up his or her rights in the property that the other would receive. However, the proof developed that, though the agreement had been entered into in contemplation of a separation, such separation never actually occurred, and they continued to live together until his death. The court, under these circumstances, said that the agreement had been abrogated. In *Simpson, Administrator* v. *Weatherman, supra,* we quoted from a

California case,[3] which, in turn had quoted from 30 C. J., § 847, p. 1066 as follows:

"Strictly speaking, a contract of separation is annulled and avoided, not solely, or necessarily as a matter of law, by a subsequent reconciliation, cohabitation, or resumption of the marital relation, but rather by the intentional renunciation of the agreement which the reconciliation and resumption of the marital relation sometimes evidences. Subsequent cohabitation has the effect of avoiding the contract so far, and only so far, as it establishes an intention to renounce the agreement."

In *Ward* v. *Ward, supra,* the parties entered into a property settlement in contemplation of divorce with Mrs. Ward quitclaiming her interest in the property to Mr. Ward. The decree was set aside by the parties and marital relations were resumed. This property settlement was entered into in 1965, and it is noticeable that Mr. Ward did not record his deed until August of 1969, at which time his wife learned that he had a teen-aged girl friend. This court held that the evidence showed that the parties intended to abrogate the property settlement at the time they caused the divorce decree to be set aside. The facts in our case are somewhat different.

The evidence reflected that Dennis became separated from his wife in early 1962, and began living openly with another woman. When asked why he executed the deed, Dennis replied:

"Well, I was away from home, your Honor, sir, and I thought it over a lot and I felt sorry for my wife and on a certain time I went out and told her—she was at home, if she would have some papers fixed up, I'd sign my part over to her. And so, that was to be—I was to sign them over to her and if she died first it would come to me and if I died first it was all to go to her. That was the agreement we made and so—"

This is the only reference to any agreement in the record, and it is a strange agreement, for if Dennis want-

[3]*Whitlow* v. *Durst,* Cal. Dist. Court of Appeal, 121 P. 2d 810.

ed his wife to simply occupy the property, she was already doing so, and as far as agreeing that the property would go to the one who last survived, no deed was necessary for they had already contracted to purchase the property as an estate by the entirety. In other words, under appellant's testimony, no rights to Mrs. Dennis were added. In the cases cited, property agreements were entered into in contemplation of divorce or separation, and each party individually gave up something, and individually acquired something, under the terms of the agreement; that is to say, there was consideration. But here, there is no evidence that Mrs. Dennis agreed to do anything as an inducement, or consideration, for Mr. Dennis to convey to her the home property. Actually, it appears that the chancellor summed it up correctly when he said:

"It is very clear. He moved in with another woman and got to feeling bad about his wife and deeded her the house. It is very clear. You can proceed. He deeded his wife the house."

It simply seems that Mr. Dennis made a gift of the property to his wife.

Another interesting circumstance indicating that Mrs. Dennis certainly didn't consider that she had agreed that he should have the property in case of her death is the fact that *on the same day* she received the deed from appellant, she executed her last will and testament leaving all of her property to the three appellees.[4] In all the record, there is no evidence that this deed was executed as consideration for the fact that Mr. Dennis would live separate and apart from his wife, would not have to pay support money, or that he or Mrs. Dennis would institute suit for a divorce.

We agree with the trial court that the evidence was insufficient to show that an agreement was ever entered into, and was insufficient to show that upon reconciliation, there was an intention to cancel the deed.

---

[4]Mrs. Dennis had the deed recorded four days after receiving it.

*It is asserted that the trial court erred in refusing to* allow appellant to introduce certain evidence. In each instance, proffer of the evidence was made by the witness. For instance, Glenn George Kennedy stated that Mrs. Dennis told him "she was not going to get any divorce, there wouldn't be any divorce". Further, "Well, she said Mr. Dennis did not want a divorce and she wouldn't let him have one if he wanted it because she loved the man more than she did her own life". We do not see how this testimony would be of any help; to the contrary, such testimony would support the chancellor's findings for this proffered testimony only bolsters appellees' argument, that there was no property settlement made in contemplation of divorce.[5]

In another instance, Dennis tried to testify that his daughter, Mary Ellen King, had told him she and her half-brother, Bob Younts, were in the house when her mother told her and Bob that if anything happened to her (Mrs. Dennis) she wanted Mr. Dennis to have the home place, and that she then tore up the deed which he had given her. This statement was objected to, the court sustaining the objection, but it was proffered. The court ruled correctly. This was hearsay evidence. Of course, Mrs. King, the daughter, could have testified to this fact herself, and Mr. Dennis could have called Mrs. King to the stand for that purpose, but this was not done. There were other instances where evidence was refused, and proffer made, but we do not consider such evidence pertinent to the issue. At any rate, if we considered the evidence admissible, we would still reach the same conclusion, for the testimony is insufficient to establish an agreement between the parties or, after rec-

---

[5]Following this testimony, Kennedy stayed with his original answer, despite a leading question. From the record:

"Q. But she did mention that a divorce had been contemplated by the parties?

A. Ask that question again.

Q. Did she use the word divorce in her conversation with you?

A. Well she did when she said they were not going to get any divorce."

onciliation, that there was an intention to abrogate the agreement.

It follows from what has been said that the judgment is affirmed.

It is so ordered.