William Loyd ARNOLD et al,
Co-Executors *v.* Lelia E. ARNOLD

76-343                                                  553 S.W. 2d 251

Opinion delivered June 6, 1977
(Division II)

*H. Zed Gant* and *Hardin, Jesson & Dawson,* by: *Bradley Jesson,* for appellants.

*J. H. Evans* and *Warner & Smith,* for appellee.

JOHN A. FOGLEMAN, Justice. This appeal involves the

validity of an antenuptial agreement between appellee Lelia E. Arnold and the late W. F. (Floyd) Arnold, which was considered by the chancery court; and the validity of claims for alleged loans allowed by the probate court which were made against the estate by Mrs. Arnold. The actions were consolidated for trial by agreement of the parties and have been consolidated for the purpose of consideration on appeal. Appellants contend that the chancery court erred in declaring the antenuptial agreement void and in finding title to various items of personal property to be in appellee and that the probate court erred in allowing the claims. We are unable to say that there was error in holding the antenuptial agreement void, but we do find error in awarding certain items of personal property to appellee and in allowing her claims against her husband's estate.

Floyd Arnold, a retired Crawford County farmer died testate December 21, 1973, leaving his widow, the appellee here, a brother and sisters. He never had any children. His first wife with whom he lived for many years died in February, 1970, when he was 64 years of age. A few months after her death he made a trip to Hawaii, in the course of which he met appellee, then Lelia Gates, a 56-year-old school teacher, whose two previous marriages had been terminated by divorce. He became enamored of her and they were married on May 30, 1970. They were separated in October, 1971, and he obtained a decree of divorce from her on November 23, 1971. They begin seeing and communicating with one another within the week following the divorce, and planned a remarriage. They entered into the antenuptial agreement in question on December 30, 1971, and were remarried on the same day, without leaving the courthouse where the agreement was signed. On the day after the remarriage, appellee gave her husband a check for $28,000 which he used to pay off a loan he obtained in raising $50,000 he paid appellee under a separation agreement entered into by the parties before their divorce. She then had $20,000 left from this payment which was deposited in a joint savings account in the Superior Savings & Loan Association in the names of W. F. Arnold and Lelia Arnold, with right of survivorship. From this account, $7,282.22 was used to pay part of the purchase price of a home in Tulsa, which was sold when they moved into a new home in Van Buren a few

months later.

The terms of the antenuptial agreement provided that appellee receive $100,000 in cash, the family automobile, and an Avion trailer. The cash payment was to be made from the husband's estate after crediting it with any sum or sums she received by reason of his death leaving her as the survivor of a tenancy by the entirety or joint tenancy. The terms of Floyd Arnold's will, executed December 31, 1971, were totally consistent with and in recognition of this agreement. The balance of his $400,000 estate was left to his surviving brothers and sisters. Appellee received $33,000 from joint accounts, $20,000 of which came from the account in Superior Savings & Loan Association.

Appellee alleged that the antenuptial agreement was invalid, void and unenforceable for various reasons, among which were: her entering into the agreement without being aware of its legal implications or of her rights, and without the advice of independent legal counsel; the violation of the husband's duty to make full disclosure to her of the nature, extent and value of his property; designed concealment by the husband presumed from the disproportionality of the provision made for appellee and his means; that Floyd Arnold's sole reason for obtaining the divorce from appellee (then unknown by her) was to obtain the antenuptial agreement and then remarry appellee; and that he accomplished this by design, studied planning, concealment and taking advantage of appellee's love and affection for him.

It is obvious that the chancellor believed the testimony of appellee and her witnesses, and we must yield to his superior position to make that judgment. In stating the facts, we will naturally have this in mind, particularly where the testimony is undisputed or uncontradicted. Appellants made several objections to some of the testimony by appellee in the trial court on the basis of the deadman's statute. Appellee contended that the deadman's statute did not apply and that, by taking her discovery deposition, appellants had waived the statute and she introduced it in evidence to show that it constituted a waiver. Appellants did not abstract that deposition because of the limited purpose for which it was introduced.

The chancellor appeared to sustain most of these objections but permitted the testimony to be proffered, with the statement that he would again consider the matter when he reached his final decision in the case, after the parties had submitted briefs. It is obvious that the chancellor, in making his findings, did consider all the testimony to which this objection was made. Appellants do not seriously argue these objections here insofar as the antenuptial agreement is concerned or cite any authority for their position in the trial court. *Dixon v. State*, 260 Ark. 857, 545 S.W. 2d 606; *Hazen v. City of Booneville*, 260 Ark. 871, 545 S.W. 2d 614. We will not consider them for this reason.

Appellee was employed as an elementary school teacher and media specialist in Florida at a salary of $10,065 per year when she met Floyd Arnold in April, 1970, just before they joined a tour to Hawaii with a group of Avion trailer enthusiasts. They were married at Van Buren. She had then sold her home in Florida and was receiving payments on the contract of sale. She owned a condominium in Florida, had an interest in property in New York, a certificate of deposit and money in a tax shelter annuity. She sold the New York property after her marriage to Floyd Arnold. The parties signed an agreement on the day before they were married, at Floyd's request. It was labeled "Antenuptial Agreement" and prepared by an attorney. It provided for payments that she should receive in lieu of any and all claims against him and his property, alimony, dower, and homestead, as a settlement of property rights in the event the marriage did not work out and there was a separation or divorce. It provided for no other eventuality. If a separation occurred during the first year, she was to receive $25,000; if during the second year, $50,000; during the third year $75,000; and, if during the fourth year $100,000. In no event was he to be liable for more than $100,000 by reason of any rights accruing to her by reason of the marriage.

The parties lived together in Van Buren during their first marriage. They travelled extensively. There is a conflict in the evidence as to how they got along, but Floyd Arnold decided he wanted a divorce. Appellee testified that he first expressed this desire to her on Saturday, October 2, 1971

She said that she was shocked and upset and the next day she went to the home of Floyd's sister, Audrey Cox, in Tulsa. She returned to Van Buren the following day and went to see a doctor, who directed that she enter the Crawford County hospital, where she remained for 17 days. Floyd Arnold came to see her there and on one occasion they discussed the divorce. He brought some papers there and told her he was filing suit for divorce, and was going to give her $50,000, according to their agreement. She executed a waiver of service and entry of appearance on the day she left the hospital and on October 22, 1971, she received two checks from Floyd totalling $50,000.

She returned to Florida in November. She was ill and Floyd drove her in an automobile she had bought with some of her own funds and $2,000 of the payment made to her by Floyd. Before he left Florida, she accompanied him to Leesburg where he purchased a new Avion trailer on November 13. The title was taken in his name, but she said she paid the balance of $4,714.47 by her check, after a "trade-in" was credited. Floyd then flew back to Arkansas. Appellee said she asked him just before he left whether he was going into the court the following Friday and get the divorce. He replied that he was. She then stopped payment on the check for the trailer.

The divorce was granted on November 23, 1971. Floyd called her by telephone six days later, saying that he wanted to come to Florida and asked her not to change her name on any papers or affairs. He also said that he needed money to pay off a note and asked her if she would let him have the money. She called him back and asked if he wanted her to fly to Arkansas and help him bring the trailer down. They agreed on this. In this or a later call by him, he mentioned remarriage, asking her if she wanted to get married in Florida or in Arkansas. She arrived in Arkansas on December 1 or 2 and gave him a check for $28,000 dated December 2, 1971. It was drawn on her bank account she had opened in a Florida bank upon closing her Arkansas bank account which had consisted of something over $3,000 from her own funds and the $50,000 paid her by Floyd. The Florida account was in the names of "W. F. Arnold or Lelia Arnold." Floyd then

broached the subject of a "premarital" agreement. They went to the office of his attorney on December 6 and discussed the matter and the attorney explained what an antenuptial agreement was. They later discussed the matter and still later returned to the attorney's office, who had then prepared a draft of a proposed agreement. Appellee said that when she asked about provision for a home for her if they did not own one when Floyd died, Floyd became "very irate," left, and later gave her another check for $28,000 dated December 9. She then left and went to visit her children in New York.

After eight or nine days, she was ill and called Floyd and told him she was going to Florida for Christmas. She actually came back to Arkansas on December 24. They spent Christmas at the home of Floyd's sister in Tulsa. Appellee said Floyd told her that he was having the antenuptial agreement redrafted; that she would have to sign it before they were remarried; that Floyd told her it could be changed and amended later; and that she signed it without protest. On the day after the remarriage, she opened an account in a Van Buren bank, with $48,000 from her Florida bank account. She immediately wrote a check to Floyd for $28,000, as he said he still owed a balance on a loan at the Peoples Bank. On the same date she opened the $20,000 account in Superior Federal Savings & Loan Association with a check on her bank account.

After this remarriage, she resigned from her position in Florida, having been on leave without pay since 1969. She also sold her condominium. According to appellee, her prospects for a substantial increase in pay had been good and if she had continued her employment, her retirement pay would have been many times the $147.73 she will receive monthly at age 65.

Appellants rely upon the basic requirements for a valid antenuptial contract stated in *Davis* v. *Davis,* 196 Ark. 57, 116 S.W. 2d 607, i.e., it must be freely entered into, not be unjust or inequitable and must be free from fraud. All these requirements must be met. Appellants emphasize appellee's education and Floyd's lack of it; the comfortable and superior lifestyle he had afforded her during the first marriage, testimony by them indicating that he did indeed have

grounds for divorce because of differences about money and travel and because she embarrassed him constantly by correcting his grammar and speech patterns before his family and friends; her opportunity to know her husband's means and the extent of his estate during the one and one-half years of their first marriage; and the failure of appellee to show that Arnold had misrepresented the value of his property.

Appellants rely heavily upon knowledge of Floyd Arnold's wealth appellee gained from her first marriage to him. In particular, they point out that the two went to his lawyer's office to prepare a joint income tax return for 1970 (which showed interest and dividend income of $14,768.56), that the couple lived comfortably and travelled extensively, that income from his investments was deposited in joint bank accounts, that they kept horses on the farm Floyd owned and went there frequently, that Floyd was retired and did no work, and that she was furnished credit cards and charge accounts and a fine automobile for her own use and was extended the privilege of writing checks on Floyd's bank account. There is evidence from which the trial court might have found in favor of appellants on these points. Some of it is in such balance that we could not sustain the court's findings without deferring to the chancellor's superior position in determining the question of preponderance. *Gammill v. Gammill*, 256 Ark. 671, 510 S.W. 2d 66; *Arkansas State Highway Commission v. Troutman*, 240 Ark. 424, 399 S.W. 2d 686.

Because of testimony relating to Floyd Arnold's conduct and statements pertaining to the divorce, the antenuptial agreement and the remarriage, we are unable to say that the chancellor's findings of fact, in the following particulars, at least, were clearly against the preponderance of the evidence:

1. W. F. Arnold had a net worth of $400,000 or more when the agreement was entered into.

2. As a result of her marriages to W. F. Arnold, appellee lost substantial future income from salary, tenure and retirement benefits. [The only testimony on the subject shows that this loss did not become final until the second marriage.]

3. Appellee was unaware of the extent of the rights she lost by executing the same.

4. W. F. Arnold did not make a full disclosure to appellee, or otherwise make her aware of the extent and value of his property prior to the time she executed the antenuptial agreement.

5. W. F. Arnold's sole reason for obtaining a divorce from the first marriage was in order to obtain the antenuptial agreement and then remarry appellee, but that this purpose was unknown to appellee until after W. F. Arnold's death. W. F. Arnold obtained the agreement through design, studied planning and concealment, which constituted fraud and overreaching on his part.

6. The antenuptial agreement was unjust, inequitable, and unconscionable in view of the circumstances.

The factors in support of the chancellor's findings that are significant and prevailing are disclosed by the testimony of three witnesses who may have been the most disinterested ones to testify, and whom the chancellor obviously found to be credible.

Mary Ann Smith, who had been married to Burl Keller, a nephew of W. F. Arnold's first wife, for five years, testified that she had maintained a close relationship with Arnold, and that Arnold and his first wife were very devoted to her children of that marriage. She had been divorced from Keller for two years before she married John Smith. During that period, Floyd Arnold bought her a house, new furniture and an automobile, and more or less supported her, according to her testimony. She said that this close relationship continued after Floyd's marriage to appellee. She testified that he came to her home and reported the separation in 1971 the day after it occurred and told her he was getting a divorce. When she asked why, he explained that he had heard that if he stayed married two or three years, appellee would get all his money; that he thought a lot of appellee; that she cared a lot about him and that after he got a marital agreement, maybe they

could get back together. She stated that he said he would have to give appellee $50,000 but maybe they could get back together if she would sign a marital agreement containing terms which were similar to those of the antenuptial agreement actually executed. She also stated that he said he was going to get the $50,000 back. According to this witness, Floyd was very upset after the divorce and tried to call appellee, once from the house where the witness lived.

Paul Alexander, an 83-year-old resident of Mulberry, who like Floyd Arnold, had retired some years earlier, also lent considerable corroboration to the testimony of appellee. He had known Floyd for 20 or 25 years, had done business with him and considered him a close friend. These two, and their wives, visited each other, both in Arkansas and in Florida after Floyd and appellee were married. Alexander said that when he read in a Van Buren newspaper that Floyd Arnold had obtained a divorce from Lelia Arnold in November 1971, he called Floyd, who told him that this was another W. F. Arnold from the town of Rudy. Shortly thereafter, the Alexanders went to Florida and contact was established between the couples. When the Alexanders went to visit the Arnolds in January 1972, according to Alexander, Floyd went with him when the ladies went into the house. He said that Floyd started telling him about the divorce proceedings. He testified that Floyd was anxious to explain because of the earlier misrepresentation about the divorce. According to him, Floyd said that a lawyer had told him that, in a second marriage with no children, if you lived with the wife one year she got one-third of the husband's estate, or after two years, she got one-half and after three years she got it all, but that after he and appellee had adjusted this like he wanted it they were married a second time. He said that Floyd said he could not live without her and that they were well satisfied now.

Clyman E. Izard, Chairman of the Board of Peoples Bank & Trust Company testified about conversations with W. F. Arnold about remarriage of the couple. Arnold often sought free legal advice from Izard, who had practiced law. He said that Arnold seemed concerned about the financial aspects. Izard said that he had asked Arnold whether he had

ever heard of a "prenuptial" agreement and had explained this concept. He was at first positive that this conversation took place after the divorce, but upon further examination could not fix the time of the conversation except to say that it took place at a time when Floyd was contemplating remarriage, which, according to him, would mean that it was before the second marriage. Of course, Arnold had heard of at least one "antenuptial agreement," even though he may not have previously gained full knowledge of the concept.

There is no indication that Floyd Arnold, who was admittedly in a confidential relationship with appellee, ever made any attempt to inform appellee of the extent of his property, even though he was insistent upon her signing the agreement before the remarriage. We note that the attorney who prepared the two drafts of the agreement at the request of Floyd Arnold and with whom the parties consulted was not called as a witness, even as to the conferences. Arnold's conduct after the divorce was quite consistent with the testimony of Mr. Alexander and Mrs. Smith (which was not really contradicted by that of Izard) as to his designs and purpose. Perhaps his beliefs about the rights of appellee after the third year of their marriage were ill founded; perhaps the witnesses did not fully understand what he was saying; perhaps Arnold's extravagant statements about his widow's rights were hyperbolic; but reference to the first "antenuptial" agreement demonstrates that it limited the amount to which she would be entitled only in case of divorce. (Floyd Arnold may even have suspected that this bargain was invalid. See *Oliphant v. Oliphant,* 177 Ark. 613, 7 S.W. 2d 783.) Under that agreement she would have been entitled to all the rights of a widow if she survived W. F. Arnold. She would have had, in addition to dower, a right of homestead in the Van Buren residence, which was valued at $30,000 to $40,000. She would have been entitled also, in addition to dower, to a widow's allowance of $2,000, furniture, furnishings, appliances, implements and equipment reasonably necessary for the occupancy of her dwelling, and a sustenance allowance of $500. Ark. Stat. Ann. § 62-2501 (Repl. 1971). She would have been entitled to an undivided one-half interest in a farm valued by an apparently well qualified real estate appraiser at $118,000. Ark. Stat. Ann. § 61-206 (Repl. 1971). The balance of his

$400,000 estate was in personalty. With personalty of $282,-000, she would have been entitled to dower of $141,000. Ark. Stat. Ann. § 61-206 (Repl. 1961). Quite a lot of this estate would have had to have been dissipated for the value of her widow's rights in W. F. Arnold's estate to be reduced to $110,000 (with the automobile and camper taken to have a value of $5,000 each, on inventory values).

Appellants argue that there was no showing as to the amount of W. F. Arnold's liabilities at the time of the signing of the agreement, but there is no indication that there were any, other than the loan he obtained to make the divorce settlement. It seems highly probable that appellant would have produced evidence of any other that existed.

In considering the evidence as it relates to the requirements for a valid agreement, it would not be unreasonable for a fact finder to infer that Floyd Arnold had established himself as the dominant personality, and that the parties married and divorced when he said they would and lived where he said they would. On both occasions he drove his bargain just before the wedding. The second wedding was obviously arranged before the signing of the agreement in question or it could not have taken place so quickly. If appellee's testimony is accepted, Floyd Arnold dictated the terms and when his terms were questioned, he flew into a rage and called off the wedding. Appellants argue that appellee was free to consult an independent attorney about the agreement, but accepting appellee's uncontradicted testimony at face value would at least arouse a suspicion that her doing so would not have pleased Floyd Arnold, to say the least.

Under the circumstances of this case, there were questions on all three essentials, i.e., whether the agreement was freely entered into, whether it was unjust or inequitable, and whether it was tainted with fraud. In *Wylie* v. *Wylie,* 249 Ark. 316, 459 S.W. 2d 127, this court emphasized the requirement of the law that a man and a woman entering into the status of husband and wife employ frankness and candor in dealing with one another. There is enough evidence of Floyd's scheme of divorce and remarriage to negate the idea

that he was frank and candid with appellee and it was not unreasonable to arrive at the conclusion that the antenuptial agreement was tainted with fraud. The widow's rights would probably have been twice as valuable as the provision for her under the agreement, so it was not unreasonable for the chancery court to conclude that the agreement was unjust and inequitable.

It must be remembered that an agreement making provision for dower must be made fairly, without fraud or imposition, with a full understanding on the part of the wife of its force and effect; that such agreements are to be regarded with the most rigid scrutiny and will not be enforced against the wife where the circumstances show that she has been overreached and deceived; that, because of the confidential relations between the parties, such an agreement is sufficiently suspicious to cast the burden of proof upon those who seek to support it to show that the husband took no advantage of his influence and knowledge and that the arrangement was fair and conscientious. *Burnes* v. *Burnes,* 203 Ark. 334, 157 S.W. 2d 24. See also, 25 Am. Jur. 2d 177, Dower, § 120; 28 CJS 125, Dower, § 55. We cannot say that this burden was met by a preponderance of the evidence, and we certainly cannot say that the chancellor's contrary holding was clearly against the preponderance of the evidence.

Appellee concedes that the deadman's statute does apply to the probate proceedings. She filed claims against the estate of W. F. Arnold for $32,068.82 and for $8,209.96, alleging that she had loaned W. F. Arnold $28,000 on December 31, 1971 (the day after the second marriage) and $7,282.22 to apply on the purchase price of the home in Tulsa, Oklahoma. She also claimed interest on the two amounts at six per cent per annum. Pertinent facts as to the $28,000 check she gave W. F. Arnold after their second marriage have been previously stated. The other item was the withdrawal from the joint account at Superior Federal Savings & Loan Association on April 13, 1971. Appellee closed her (joint) account in the Florida bank on December 31, 1971 by opening the Superior Federal Savings & Loan Association account and by writing the $28,000 check to her husband, who then paid off a bank loan he had obtained to give her the check on December 9. It

seems to us that it was the clear intention of the parties to abrogate the property settlement made pursuant to the first "antenuptial agreement" in connection with the divorce.

Appellee observed that the cases cited by appellants concern relations where there was either no final divorce decree or the decree was vacated or annulled by the agreement of the parties, and argues that those cases do not apply because in this case there was a final divorce which was not vacated or annulled.

It is generally said that a separation agreement is abrogated when the parties resume a marital relationship because the consideration for the settlement fails, at least insofar as the executory provisions are concerned; although in some jurisdictions the question of whether a separation agreement survives a reconciliation depends on the intention of the parties. But, when there is a property settlement, it is generally held to be a final and binding contract between the parties which can only be voided by mutual agreement. Reconciliation alone does not terminate the settlement. Therefore the settlement survives the reconciliation unless the court can find an intention or an express agreement that it shall not survive. See: Annot, 35 ALR 2d 707 · (1954), supplementing 40 ALR 1227 (1926); Lindey (1976), Separation Agreements and Ante-Nuptial Contracts, vol. 1, § 8 par. 10, pp. 8-11 to 8-23.

It is the nature of the agreement, then, rather than the precise condition of the marital relationship that has been a distinguishing factor in determining whether, and under what conditions the respective agreements survive reconciliation. We have assiduously avoided making this distinction, and properly so, considering the fact that it is often difficult to determine whether a document is a separation agreement or a property settlement. In all cases it has been the intention of the parties, as evidenced by their relationship and their treatment of the property involved, which has determined whether the bargain survives. See, e.g., *Ward* v. *Ward*, 249 Ark. 1001, 463 S.W. 2d 90; *Dennis* v. *Younts*, 251 Ark. 350, 472 S.W. 2d 711. In *O'Quin* v. *O'Quin*, 217 Ark. 321, 230 S.W. 2d 16, a property settlement was signed and the wife made deeds to

the husband of property which they had held in tenancy by the entirety. A divorce decree was entered but a short time later was annulled. Four months later the wife filed for divorce and requested that the deeds be set aside. The divorce was not granted but, on appeal, the Supreme Court, reversing the trial court, held that she showed by a preponderance of the evidence that they had resumed their former married status in every respect "which, in effect, cancelled their property settlement . . . " The court observed that she delivered to her husband all the property she received in settlement and deposited the money in their joint account. "There appears to have been no effort by them during this period to separate their property interests." In making this determination the court quoted from and followed as authority rules set out in *Sherman* v. *Sherman,* 159 Ark. 364, 252 S.W. 27 and *Carter* v. *Younger,* 112 Ark. 483, 166 S.W. 547. Both those cases involved separation agreements.

That a distinguishing feature in the survival of a property settlement incident to divorce is remarriage rather than annullment of the divorce has not been mentioned in any of the authorities that we have examined and appellee has not directed us to any authorities which have so distinguished the cases. When we consider the conduct of the parties and their handling of the money involved we can only find that the clear preponderance of the admissible evidence shows that the property settlement was abrogated and that the probate court erred in finding that these sums were due and owing by the decedent to the appellee at the time of his death.

We agree with appellants that the chancery court erred in holding that appellee was entitled to a Lady Elgin watch, a .38 caliber pistol, and a set of wedding rings which had belonged to W. F. Arnold's first wife. There is no evidence to support a gift to appellee without her testimony, which was clearly barred by the deadman's statute. See *Greer* v. *Stilwell,* 184 Ark. 1102, 44 S.W. 2d 1082. Significantly, appellee does not argue the validity of these gifts on appeal. As to other items of personal property claimed by appellee as her property, the deadman's statute had no application. Her testimony that she owned certain items of household goods and appliances before either marriage and that certain other

items were purchased with her own funds is not contradicted. As to other items of this nature, appellee's testimony as to the manner in which they were purchased and paid for was not barred by the deadman's statute. Neither was it contradicted. We cannot say that the holding of the chancery court was against the preponderance of the evidence as to these items.

The decree of the chancery court is affirmed, insofar as it relates to the cancellation of the antenuptial agreement and the award of personal property, except for the wristwatch, pistol and the set of wedding rings, as to which the decree is reversed. The judgment of the probate court is reversed insofar as it relates to claims of appellee against the estate of W. F. Arnold.

We agree. HARRIS, C.J. and HICKMAN, J. BYRD, J., concurs.

CONLEY BYRD, Justice, concurring. Because of the testimony of Mrs. Smith and Mr. Alexander I cannot say that the chancellor was in error in finding that Mr. Arnold fraudulently overreached appellee in procuring the antenuptial agreement. However, I take this occasion to point out that our laws on antenuptial agreements especially among persons beyond the child bearing age — need a substantial revision in view of the educational and business acumen of the present day woman.

For the reasons stated I concur in the result of the majority.

HARRIS, C.J., joins in this concurrence.