Marcus D. FAVER, Albert FAVER
And Jack FAVER, Co-Executors of The Estate
of Marcus C. FAVER and Individually *v.* Pearl FAVER

78-156                                         583 S.W. 2d 44

Opinion delivered July 2, 1979
(In Banc)

*Drake, Bynum & Dennis, Ltd.,* and *Bridges, Young, Matthews & Davis,* for appellants.

*Coleman, Gantt, Ramsay & Cox,* for appellee.

PHILLIP CARROLL, Special Chief Justice. In September, 1967, Marcus D. Faver, 69, a widower and father of three adult sons, proposed marriage to Pearl Hughes, 66, a widow and mother of three adult daughters. Mrs. Hughes, having completed the 9th grade in school, had married Bedy Hughes, a farmer, in 1919 and they had lived in the England, Arkansas area for 46 years before Mr. Hughes' death in 1965. Mr. Faver's wife, Louise, had died in February, 1967. Pearl and Louise had been schoolmates as girls, and after their marriages, the two couples maintained some social contact through the years.

Marcus Faver's courtship of Pearl Hughes was short. He was a farmer, and his proposal of marriage was conditioned upon the signing of an agreement that his land would not be taken away from his boys. Initially, Mrs. Hughes refused, but she testified that Mr. Faver assured her that she would be provided with money and she agreed to sign an agreement. Furthermore, she testified that she was motivated to sign by her understanding that Mr. Faver's son, Albert, who had built a new home, had said he would move if his father's new wife claimed an interest in the land. Mrs. Hughes' own estate at that time consisted of 106 acres of farmland, a savings account of about $1,000, and another account containing a moderate sum. She had executed a Will following the death of Mr. Hughes leaving all of her property to her three daughters. She disclaimed any knowledge of laws relating to dower, curtesy, homestead, or statutory allowances for widows.

On October 18, 1967, Marcus Faver took his fiancee to the office of his lawyer, Ralph Ray, for the purpose of signing an antenuptial agreement drafted by Ray at the request of Mr. Faver. The sole testimony concerning the events that

transpired in Ray's office came from the appellee, Pearl Faver, who said that only the three of them were present and that no explanation was given concerning the nature, extent, or value of Mr. Faver's property nor of the nature or extent of the legal rights which she was surrendering. She said she did not read the agreement nor was it read or explained to her, and that the paper was folded on Mr. Ray's desk as she signed it so that only the signature line was exposed to view. After the signing, Mr. Ray folded it and gave it to Mr. Faver. Mrs. Faver explained her conduct by stating that she trusted her fiance, and she said that she was unaware that the agreement provided that she was to receive the sum of $2,500 in consideration of her waiver of dower, homestead, statutory allowances, or other rights in her future husband's estate. A party's testimony is not treated as undisputed, *Raiborn v. Raiborn*, 254 Ark. 711, 495 S.W. 2d 858 (1973). This does not mean, however, that the Chancellor, who had the advantage of observing Mrs. Faver's demeanor, was obligated to disbelieve her testimony.

The antenuptial agreement also provided that Mr. Faver waived all claims including curtesy in his wife's estate. In the absence of this provision, it would only have been necessary for Mrs. Faver to execute a new will following her marriage in order to divest her husband of his curtesy. Ark. Stat. Ann. § 60-501. (See compiler's notes showing the language of this statute prior to the 1970 amendment.) Mrs. Faver contended that a day or so later her fiance gave her a $2,500 check which was dated October 18, 1967. This check was received in evidence and marks on it show that it cleared the bank on October 26.

It was stipulated that on the date of execution of the antenuptial agreement Marcus Faver was the owner of a one-half interest in 80 acres in Jefferson County, a two-thirds interest in another 52 acres, and that he owned outright another 700 acres of which 600 acres were used for farming. The farmland had an estimated value of $375 per acre. It was also stipulated that the 106 acres then owned by Mrs. Hughes were worth approximately $375 per acre. The stipulation was silent as to the ownership of personal property by either party.

The Chancellor excluded as a violation of the parol evidence rule Mrs. Faver's testimony that the tender of the $2,500 was accompanied by Mr. Faver's oral assertion that he was giving the money to her and that she should take it and use it as she pleased, and that when the crop was gathered, more money would be given. The ruling of the court on this evidentiary issue is assigned as error on the cross-appeal. Appellee argues that the statement was admissible because it was made subsequent to the execution of the contract. It is true that the parol evidence rule creates an impediment only to the introduction of prior or contemporaneous oral agreements or prior written agreements offered to contradict or vary a written agreement. *Scope and Operation of the Parol Evidence Rule in Arkansas,* 4 Arkansas Law Review 168 (1950); *Restatement, Contracts* §237 (1934); *American Southern Trust Co.* v. *McKee,* 173 Ark. 147, 293 S.W. 2d 50 (1927). We do not understand that the statement purportedly made by Mr. Faver when he delivered the $2,500 check to his fiancee was offered to contradict or vary the prior written agreement. If it had been, then it is at least arguable that in the context of the particular circumstances, the delivery of the check was effectively contemporaneous even though a day or two late in time. We see the proffered evidence as being relevant to a different issue. If Mrs. Faver's testimony concerning the events that occurred in Mr. Ray's office is to be believed, then the statement made by Mr. Faver upon delivery of the check was admissible in further support of the designed concealment that was presumed to exist when credible evidence was introduced to show a substantial disproportion between the $2,500 and the size of his estate as well as a lack of disclosure. The evidence was admissible to throw light on the circumstances of the making of the contract. The statement attributed to Mr. Faver could be construed as an attempt on his part to avoid any further question with regard to the written contract that his fincee had signed but had not read.

Mr. Faver and Mrs. Hughes were married on November 4, 1967. Sometime later, Mrs. Faver sold 51 acres of her farmland and bought a $41,500 house in England into which she and her husband moved, but the property was deeded to her alone. Mr. Faver gave her $1,500 to get settled in the new

house. She testified that she considered it a loan, but when she offered to pay it back, he refused, suggesting that it was equal to the amount he had just spent to buy the boys a new disc. At other times, Mr. Faver gave his wife $3,000 and $4,-100. Mrs. Faver said, "I just figured Mr. Faver was giving it to me." Mr. Faver turned over to his wife his social security checks, which she deposited along with her own in a joint bank account and she would give him money whenever he asked for it. Mrs. Faver developed a serious medical problem for which she sought treatment in California, and Mr. Faver would send her $100 per month while she was there. Mrs. Faver said she purchased clothes and gifts for her husband out of her own money.

Four or five years after their marriage, Mrs. Faver read the antenuptial agreement aloud to Mr. Faver and she testified that he commented that he did not tell Ralph Ray to fix those papers in that condition and ". . . that wasn't the way he wanted them drawn up." The evidence does not suggest that on this occasion he disclosed the extent of his estate or the amount she had surrendered in return for the $2,-500 she had received.

Mrs. Faver testified that until a divorce suit commenced in 1977, she never learned the amount of property that was owned by her husband. She acknowledged that she knew when she was contemplating the marriage that Mr. Faver was a man of some means—that he owned at least a part interest in more than 40 acres. She said she never quizzed him except that on one later occasion, she asked how many acres he owned with Miss Sadie (his brother's widow) at Swan Lake, and he said he didn't know and that he "would have to figure." According to Mrs. Faver, at different times during their marriage, her husband told her that she would be taken care of—that he wanted the boys to have the land to farm and that Mrs. Faver would receive her part in cash money. On the other hand, he told her he did not have a will because wills were made to be broken.

On February 23, 1977, approximately ten years after their marriage, Mr. Faver executed a will leaving his entire estate to be divided equally between his three sons. In the late

spring of 1977, Mr. and Mrs. Faver became estranged and they separated on May 26, 1977. On June 8, 1977, Marcus Faver filed suit for divorce. Pearl Faver answered and counterclaimed. Mr. Faver died unexpectedly on December 7, 1977 at the age of 79 before any action had been taken in the divorce proceeding. Mrs. Faver then brought the action from which this appeal lies seeking cancellation of the antenuptial agreement and an award to her of her statutory rights in the property of her deceased husband.

Ralph Ray, though living in England at the time of the trial, was neither deposed nor called as a witness by either party. When the Chancellor proposed that Mr. Ray be called as a witness of the court pursuant to Rule 614, Uniform Rules of Evidence, the appellants made no objection and stated that any attorney-client privilege was waived. Pearl Faver's attorney, on the other hand, objected, stating that the court should not try to defend the lawsuit but should leave it up to the defendants to call witnesses to prove that the antenuptial agreement was validly entered into. He preferred to take safe advantage of appellant's failure to call Mr. Ray and argued that an inference unfavorable to appellants arose when the attorney who was within the subpoena power of the court and who was employed to prepare the agreement was not called to testify in its support. *Cf. Canal Ins. Co.* v. *Hall*, 259 Ark. 797, 536 S.W. 2d 702 (1976); *Phillips Const. Co.* v. *Williams*, 254 Ark. 824, 496 S.W. 2d 417 (1973); *Ark. State Highway Comm.* v. *Phillips*, 252 Ark. 206, 478 S.W. 2d 27 (1972); *Reliable Life Ins. Co.* v. *Elby*, 247 Ark. 514, 446 S.W. 2d 215 (1965). The Chancellor then commented that he wanted to get the truth, and he instructed the bailiff to phone Mr. Ray at England, a driving distance of only 45 minutes from the Jefferson County Courthouse. When it was reported that Mr. Ray could not be reached, no further effort was made to produce him nor did either party ask for a continuance or other remedy. In McCormick's Handbook on Evidence, 2d Ed. (1972) §272, caution is suggested in allowing the inference. Among other things, it is there stated that conjecture or ambiguity of inference is often present, and the availability of modern discovery procedures serves to diminish both the justification and need for the inference. Here there is no compulsion to decide whether or not an inference adverse to appellants

arose upon their failure to call Mr. Ray. Where the provision in an antenuptial agreement is disproportionate to the means of the intended husband, a presumption of designed conceal-ment is raised, which throws the burden upon those claiming in his right to prove that there was full knowledge on the part of the intended wife of all that materially affected the con-tract. *Davis v. Davis,* 196 Ark. 57, 116 S.W. 2d 607 (1938); *Burnes v. Burnes,* 203 Ark. 334, 157 S.W. 2d 24 (1941); *Wylie v. Wylie,* 249 Ark. 316, 459 S.W. 2d 127 (1970); *Arnold v. Arnold,* 261 Ark. 734, 553 S.W. 2d 251 (1977). This presumption needed no adverse inference to support it where there was no preponderating proof that Mrs. Faver knew the nature and extent of her husband's property. In *Arnold v. Arnold, supra,* it was noted that the attorney who prepared the two drafts of the antenuptial agreement at the request of Floyd Arnold and with whom both parties consulted was not called as a witness even as to the conferences. There the court pointed out that the presumption of designed concealment must be overcome by a preponderance of the evidence. See generally Rule 301(a) Uniform Rules of Evidence, providing that a presump-tion imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence. The disproportion between a widow's dower in the land owed by Mr. Faver in 1967 and the sum of $2,500 is apparent. The stipulation covered only Mr. Faver's landholdings and no effort was made to prove the extent of his personal property. He must have possessed some personal assets because he made sub-stantial cash gifts to Mrs. Faver during their marriage. The burden of proof was upon the appellants to prove by a preponderance of the evidence that Mrs. Faver had full knowledge of all that materially affected the contract.

The only witnesses produced by appellants were Sadie Faver, a sister-in-law to Marcus Faver; Kay Faver, a daughter-in-law of Marcus Faver; and Albert Faver, the mid-dle son of Marcus Faver and co-executor of his estate. Sadie Faver said that after the death of her husband, E. C. Faver in 1961, she discussed with Pearl Hughes how E. C. Faver had disposed of his property. Marcus Faver had inherited 135 acres from E. C. Faver's estate. She had no knowledge of the value of Marcus Faver's estate nor the extent of his

landholdings on October 18, 1967. She said that Marcus Faver wasn't noted for telling his business. She acknowledged that both Pearl and Marcus Faver were known to her to be truthful persons. Kay Faver stated that within a month after the marriage of Marcus and Pearl Faver, Pearl had stated that she wanted nothing that Louise [Faver] had saved and worked for during their life and that her own estate was for her children and that is what the marriage agreement was for. Kay Faver knew nothing about the number of acres owned by Marcus Faver or the value of his estate. She had been present when Marcus Faver had discussed the marriage agreement with his sons, but she did not recall that Pearl Faver was present. Albert Faver denied that he had ever made a statement to the effect that he would move off of the property if his father did not get a marriage agreement with Pearl Hughes. He should know, so there was apparently no detrimental reliance on his or his father's part on this account although Pearl had understood that he made the threat.

Appellants contended that Pearl Faver was estopped to deny the validity of the antenuptial agreement because she had accepted $11,100 from Mr. Faver following execution of the agreement and that she had in addition drawn $990 from the joint bank account of the parties after her separation from her husband. We find nothing in the record to suggest that this money was accepted by her as her share of the estate. The Chancellor found that the original payment of $2,500 and the three subsequent payments totalling $8,600 were not gifts but that all of these sums were given in consideration for signing of the antenuptial agreement as amended by subsequent oral modification. In other words, the Chancellor found that the written agreement was amended by Marcus Faver's action in making subsequent gifts to his wife so that when the agreement was voided, the total sum of $11,100 should be returned to the estate to place the parties in the same condition they were in before the contract was signed. There is no evidence to suggest that the gifts of $8,600 made subsequent to the marriage were in fulfillment of an amendment to the written contract and therefore that portion of the Chancellor's Order which required the return of this sum to the estate is reversed. On the other hand, the $2,500 given to Mrs. Faver soon after the agreement was signed should be

credited to her share of her husband's estate, since the agreement is invalid. The Chancellor made no order concerning the sum of approximately $990 withdrawn by Pearl Faver from the joint bank account after their separation but left this matter for appropriate adjudication in the Probate Court proceeding. No contention is made that this ruling was erroneous.

In support of their estoppel argument, appellants cite *Comstock* v. *Comstock,* 146 Ark. 266, 225 S.W. 621 (1920). There the parties entered into an antenuptial agreement wherein the wife agreed to take a child's interest in lieu of dower since the husband had six children by a prior marriage. After the parties had lived together for about five years, the husband paid $2,000 to his wife in settlement of the antenuptial contract. Later, the wife refused to release her dower interest in certain real estate and an action was filed against her to confirm the antenuptial contract and the settlement. The testimony was conflicting, but the court held that it was convinced from the evidence that the antenuptial agreement was a just and reasonable one. The $2,000 that was paid to the wife was in lieu of the provisions made for her in the antenuptial agreement. No charge of fraud was made. Since the contract was fair and reasonable, it was upheld and since the wife had accepted the $2,000 as her share of her husband's estate, she was held to be estopped from claiming that the agreement by which this settlement was consummated was invalid. On the other hand, Mrs. Faver should not be estopped merely because she accepted $2,500 particularly since she said she was promised her share in cash and the appellants failed to produce a preponderance of the evidence to overcome the presumption of designed concealment.

Appellants contend that appellee could reasonably have acquired knowledge concerning the extent of her husband's estate, citing *Hughes* v. *Hughes,* 251 Ark. 63, 471 S.W. 2d 355 (1971). There, Ethel H. Hughes, an experienced real estate broker who was familiar with most of the property of Judge Hughes, her fiance, examined the antenuptial agreement about two weeks before she signed it. She admitted that she had an opportunity to take it to one of the several attorneys with whom she had previously consulted on real estate

matters on at least half a dozen occasions. The agreement was upheld in a subsequent divorce proceeding where no contention was made that Judge Hughes had set a value on his properties which was less than actual, and there was no evidence of designed concealment nor of fraud in any respect. The opinion states that Mrs. Hughes could reasonably have had, or acquired, a knowledge of the value of the properties before the agreement was executed, so that a mere disproportion between Judge Hughes' means and the provisions made for his wife was insufficient to void the agreement. The circumstances in *Hughes* do not compare with the events that transpired in Mr. Ray's office as described by Mrs. Faver, nor with the promise of Mr. Faver that his boys would get his land but his widow would get her share of his estate in cash. Even if Mrs. Faver had been given an opportunity to search out Mr. Faver's real estate holdings, it would be difficult, to say the least, for her to ferret out the extent of his personal property estate. She was not required to do so. All that was required to make the antenuptial agreement final and binding was for Mr. Faver to employ the frankness and candor that married people have the right to expect of one another and which usually leads to a successful marriage. Senior citizen though he was, he assumed the obligation to love, honor, and support his bride, and to honor her dower rights until she voluntarily surrendered them in a knowing way. On the other hand, Mrs. Faver was free to divest her husband of curtesy in her estate at any time after their marriage.

Pearl Faver is entitled to have all rights in the estate of her deceased husband, Marcus C. Faver, afforded to widows under the law, diminished only by the sum of $2,500, plus interest thereon at 6% from October 18, 1967 to December 7, 1977 (the date of Mr. Faver's death) amounting to $1,520.54.

HARRIS, C.J., and FOGLEMAN and HOLT, JJ., not participating.

Special Justice THOMAS B. BURKE joins in the majority opinion.

Special Justice WILLIAM J. WYNNE and BYRD and HICKMAN, JJ., dissent.

WILLIAM J. WYNNE, Special Justice, dissenting. My dissent is based on the fact that appellee by her own testimony clearly understood that the lands owned by Marcus D. Faver were to go to his three sons upon his death and that the agreement which she signed some seventeen days prior to her marriage to him was for that purpose. She further testified Mr. Faver told her that unless she signed such agreement they could not get married.

The principle that antenuptial agreements must be freely entered into, must not be unjust or inequitable and must not be tainted with fraud has been announced in many prior decisions of this Court. *Wylie* v. *Wylie*, 249 Ark. 316, 459 S.W. 2d 127 (1970); *Hughes* v. *Hughes*, 251 Ark. 63, 471 S.W. 2d 355 (1971). Here the appellee testified that Marcus Faver did not force her to do anything so that the contract between the parties would appear to have been freely entered. Neither is any contention made that such contract be tainted with fraud. If the same is to fail, then it must be struck down as being unjust or inequitable based upon the presumption of designed concealment arising solely because the provision for the intended wife is disproportionate to the means of the intended husband.

It would appear that the marriage between these parties resulted primarily from their desire for compansionship. He was 69 and she was 66. The prior marriage of each party had been terminated by the death of their previous spouse. Similarly, each had three children as a result of their earlier marriage and both naturally thought of the interests of their children when remarriage was considered.

It is difficult to understand how Marcus Faver could have been any more straight forward or candid with appellee. She testified he made it clear that unless she signed the agreement so that his boys could keep the lands, they could not get married. Appellee therefore clearly understood prior to the time she signed the agreement that Mr. Faver's three sons would keep the farm and farm it. Under these circumstances it seems unjust and inequitable to declare invalid the antenuptial agreement between the parties which the majority here says must fail.

I would further take this occasion as did Justice Conley Byrd in his concurring opinion in *Arnold* v. *Arnold*, 261 Ark. 734, 553 S.W. 2d 251 (1977) to point out that our laws on antenuptial agreements especially among persons beyond the childbearing age need to be substantially revised.

BYRD, J., dissents.